982 So.2d 234 (2008)
Donna and James WHITE, Plaintiff-Appellant
v.
Kim GOLDEN, Individually, Stephen Harrison, Individually and The Law Firm of Shafto & Ashbrook and L. Michael Ashbrook, Individually, Defendant-Appellee.
No. 43,076-CA.
Court of Appeal of Louisiana, Second Circuit.
April 30, 2008.
Rehearing Denied May 29, 2008.
*237 Jacques F. Bezou, Covington, Alfred B. Shapiro, Baton Rouge, for Appellant.
David F. Butterfield, Shreveport, for Appellee.
Before BROWN, C.J., and WILLIAMS and CARAWAY, JJ.
WILLIAMS, J.
Plaintiff, Donna White, seeks reversal of the district court's ruling granting summary judgment in favor of defendants, Kim Golden, Michael Ashbrook and the Law Firm of Shafto & Ashbrook.[1] For the reasons that follow, the judgment of the district court is hereby reversed and we remand this matter for further proceedings.

FACTS
On August 22, 1996, Stephen Harrison, an attorney at the law firm of Shafto & Ashbrook ("the law firm"), filed a lawsuit on behalf of plaintiff against her former employer, Infusion Associates, Inc. ("Infusion") and some of its corporate principals. Plaintiff began working at Infusion in October 1995 as the general manager for clinical pharmacies and pharmacy director. Her supervisor was Eric Liew, Infusion's business manager and one of the company's directors and shareholders. Dr. C. Russ Greer, a neurosurgeon in Monroe, was also a director and shareholder.
It was agreed that plaintiff would design, open and manage Infusion, which would be used as a model for other locations in Lafayette, Louisiana and Dallas, Texas. Plaintiff agreed to go to each proposed location to establish and open the business and another pharmacist would be hired for the Monroe location. It was also agreed that plaintiff could acquire a 10% ownership interest in the Infusion businesses by making a one-time payment of $50,000 during the company's first year of operation.
Infusion began accepting patients in April 1996. By mid-May 1996, the business began to founder and plaintiff learned that the business would not be expanded to Lafayette. In June 1996, the board of directors decided to place all of Infusion's *238 employees on probation for 90 days due to the poor financial condition of the company. Dr. Greer testified that the purpose of the 90-day period was to give the board an opportunity to ascertain whether the company's financial condition would improve.
At some point, Ricky Guillot, Infusion's financial advisor, reviewed Infusion's financial status and advised the board that plaintiff's salary, $5,000 per month, was the single largest company expense. Guillot recommended reducing the budget by making plaintiff a part-time pharmacist and re-assigning her managerial duties. Liew recommended terminating plaintiff, but Infusion's board of directors approved Guillot's recommendation to demote plaintiff. Paul David Young assumed the managerial responsibilities of the business.
Prior to informing plaintiff that she would be demoted, Liew testified that he began contacting other pharmacists about a possible part-time pharmacist position, "just in case" plaintiff refused to accept the demotion to part-time status. On June 24, 1996, Liew and Guillot met with plaintiff and informed her of the new budget and her demotion to a part-time pharmacist.
At some point in June 1996, a board meeting was held to discuss complaints that plaintiff had made to Dr. Greer about Liew. Initially, plaintiff was invited to attend the meeting and address the concerns, but the invitation was rescinded because Liew refused to attend the meeting if plaintiff was in attendance.[2] During this meeting, plaintiff's job performance was also discussed.[3] Plaintiff worked as a part-time pharmacist for a short time, but she was terminated on July 1, 1996.
Plaintiff's lawsuit against Infusion was based on allegations of breach of contract, sex discrimination, sexual harassment, defamation, intentional infliction of emotional distress and tortious interference with a contract. The prosecution of the lawsuit was conducted pursuant to a contingency fee agreement. Harrison later left the law firm and defendant, Kim Golden, assumed the representation of plaintiff. Neither Harrison nor Golden filed a motion to withdraw as counsel, and the lawsuit was dismissed as abandoned in May 2003.
Subsequently, plaintiff sued Golden, Harrison, the law firm and Michael Ashbrook, alleging defendants were negligent in allowing her lawsuit to be abandoned. On April 27, 2004, the district court dismissed Harrison as a defendant because he had left the law firm on July 31, 2000, long before the underlying lawsuit was abandoned. On January 27, 2007, the remaining defendants moved for summary judgment and the district court granted summary judgment, dismissing plaintiff's legal malpractice action. This appeal followed.

DISCUSSION
Plaintiff contends summary judgment in favor of the defendants was improper. Plaintiff argues that summary judgment is inappropriate to dispose of a legal malpractice *239 action, thus the district court erred in granting summary judgment.
In determining whether summary judgment is appropriate, appellate courts are to review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is proper. Suire v. Lafayette City-Parish Consolidated Government, XXXX-XXXX (La.4/12/05), 907 So.2d 37. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action and shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(A)(2) and (B).
The burden of proof remains with the movant. LSA-C.C.P. art. 966(C)(2). However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Id. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Id.
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967(B).
To establish a claim for legal malpractice, a plaintiff must prove: (1) the existence of an attorney-client relationship; (2) negligent representation by the attorney and (3) loss caused by that negligence. Costello v. Hardy, XXXX-XXXX (La. 1/21/04), 864 So.2d 129.
In Jenkins v. St. Paul Fire & Marine Ins. Co., 422 So.2d 1109 (La.1982), the plaintiff filed a legal malpractice action against his two former attorneys, alleging that the attorneys allowed prescription to run before filing suit on a personal injury claim. The attorneys conceded that they did not file the suit until two days after prescription had run. The Supreme Court stated:
Causation, of course, is an essential element of any tort claim. However, once the client has proved that his former attorney accepted employment and failed to assert the claim timely, then the client has established a prima facie case that the attorney's negligence caused him some loss, since it is unlikely the attorney would have agreed to handle a claim completely devoid of merit. In such a situation, a rule which requires the client to prove the amount of damages by trying the "case within a case" simply imposes too great a standard of certainty of proof. Rather, the more logical approach is to impose on the negligent attorney, at this point in the trial, the burden of going forward with evidence to overcome the client's prima facie case by proving that the client could not have succeeded on the original claim, and the causation and damage questions are then up to the jury to decide.
Id. at 1110.
In the instant case, it is undisputed that an attorney-client relationship existed between *240 plaintiff and defendants. The record contains a retainer agreement between plaintiff and the law firm. On August 22, 1996, Harrison filed a petition on behalf of plaintiff, naming Infusion, Greer and Liew as defendants. It is also undisputed that the lawsuit was abandoned in May 2003. Thus, plaintiff has proved that the law firm and its employees accepted employment and failed to continue prosecution of the claim. Pursuant to Jenkins, supra, plaintiff has established a prima facie case that defendants' negligence caused her some loss.
It was incumbent upon defendants to prove that plaintiff could not have succeeded on her original claims against Infusion. See Jenkins, supra, at 1110. Defendants contend they met their burden of proof. Although they vigorously prosecuted plaintiff's suit against Infusion over a period of time, defendants now argue that there was no validity to the claims plaintiff asserted.
Breach of Contract
In the underlying petition for damages, plaintiff alleged that she entered into the following agreement with Greer and Liew:
Plaintiff would design, open and operate an Infusion pharmacy business in Monroe with the assistance of Greer, Liew and Billy Amos;
Greer and Liew would raise the necessary capital to begin operating the pharmacy business;
The business would be used as a model that could be duplicated in Lafayette, Louisiana and Dallas, Texas;
Plaintiff would complete the necessary tests to become licensed to practice pharmacy in Texas;
Plaintiff would go to each location to establish and open an Infusion business and another pharmacist would be hired for the Monroe location;
Plaintiff could acquire a 10% ownership interest in the Infusion businesses by making a one-time payment of $50,000 during the company's first year of operation;
Greer would serve as President of the business, Liew would serve as Vice-President, plaintiff would serve as General Manager and Amos would be a consultant;
Plaintiff's job responsibilities included sales, marketing, business development and pharmacy director;
Liew was plaintiff's immediate supervisor and his responsibilities included sales, marketing, business development and administrative matters.
Plaintiff also alleged that once the business began, defendants failed to execute the terms of the contract in good faith. More specifically, plaintiff contended Liew breached his agreement to market the business and Liew prevented plaintiff from marketing the business to potential referral sources.
Contracts must be performed in good faith. LSA-C.C. art.1983. An obligor in good faith is liable for the damages that were foreseeable at the time the contract was made. LSA-C.C. art.1996. An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. LSA-C.C. art.1997.
In Louisiana AG Credit, PCA v. Livestock Producers, Inc., 42,072 (La.App.2d Cir.4/4/07), 954 So.2d 883, writ denied, XXXX-XXXX (La.9/14/07), 963 So.2d 1001, this court stated:
Black's Law Dictionary defines "good faith" as "an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable *241 advantage, and an individual's personal good faith is a concept of his own mind and inner spirit. . . . "
Black's Law Dictionary defines "bad faith" as follows:
The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term `bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.
Summary judgment is seldom appropriate for determinations based on subjective facts of motive, intent, good faith, knowledge, or malice. One reason is that these subjective facts call for credibility evaluations and the weighing of testimony. Furthermore, the circumstantial evidence usually necessary for proof of motive or intent requires the trier-of-fact to choose from competing inferences, a task not appropriate for a summary judgment ruling.
Id. at 890-91 (internal citations omitted). This court then concluded that a genuine issue of material fact existed with regard to whether the defendant's actions "were prompted by a `dishonest purpose or moral obliquity' and/or `furtive design or ill will,'" and concluded that summary judgment was inappropriate. Id.
In the instant case, plaintiff testified with regard to her claim for breach of contract. It is apparent from the testimony of plaintiff, Liew and Dr. Greer that some animosity existed between plaintiff and Liew. The testimony raised a genuine issue of material fact with regard to whether Liew's actions were prompted by a "dishonest purpose or moral obliquity" and/or "furtive design or ill will." A jury could have concluded such. Therefore, we conclude that the district court erred in granting defendants' motion for summary judgment.
Sex Discrimination/Sexual Harassment
Defendants contend plaintiff could not have prevailed on her claims for sex discrimination and sexual harassment because (1) Title VII does not apply to Infusion since the company did not have fifteen or more employees and (2) plaintiff's testimony refuted her claims that she was terminated because of her sex and that Infusion created a hostile work environment.
Pursuant to Title VII of the Civil Rights Act of 1964, it is unlawful for "an employer . . . to discriminate against [any employee] with respect to . . . sex." 42 U.S.C. § 2000e-2(a)(1). An "employer" is a "person . . . who has fifteen or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).
The joint-employer test addresses whether two independent entities share or co-determine those matters governing the essential terms and conditions of employment such that both entities can be considered employers of the same individuals for purposes of Title VII. Hurde v. Jobs Plus-Med, 299 F.Supp.2d 1196 (D.Kan. 2004). To determine whether two entities should be treated as a single employer, courts consider whether the two entities have: (1) interrelated operations; (2) centralized control of labor relations; (3) common management and (4) common ownership or financial control. Parrish v. Sollecito, 280 F.Supp.2d 145 (S.D.N.Y. *242 2003); Scheidecker v. Arvig Enterprises, Inc., 122 F.Supp.2d 1031 (D.Minn.2000); Walker v. Toolpushers Supply Co., 955 F.Supp. 1377 (D.Wyo.1997). No single factor is dispositive; the relationships are viewed in their totality. Graves v. Lowery, 117 F.3d 723 (3d Cir.1997).
Whether a person or corporation is an employer or joint employer is essentially a question of fact. Beliz v. W.H. McLeod & Sons Packing Co., 765 F.2d 1317 (5th Cir.1985); Hodgson v. Griffin and Brand of McAllen, Inc., 471 F.2d 235 (5th Cir.1973). This conclusion is subject to review under the clearly erroneous standard. Id.
In this case, plaintiff submitted an affidavit which established that Infusion operated out of the same office space as two related corporations, AOSS Medical Supply, Inc. and AOSS Home Health Medical, Inc. The three corporations issued a joint employee manual, and Dr. C. Russ Greer and Eric Liew were the principal shareholders and managers of all three entities. Plaintiff performed management services for all three companies and employees of each entity performed services for the others. The three companies combined had more than 15 employees in 1996.
Our review of the record persuades us that plaintiff's statements contained in her affidavit created a genuine issue of material fact with regard to whether Infusion, AOSS Medical Supply, Inc. and AOSS Home Health Medical, Inc. were joint-employers for the purposes of Title VII. Therefore, summary judgment was inappropriate.
Defendants also argue that plaintiff was not terminated because of her sex. Dr. Greer testified that once plaintiff was demoted to a part-time pharmacist, she became less cooperative. Although plaintiff was still the pharmacist for the business, she failed to follow pharmacy procedures, and at times, would not come to the business to deactivate the pharmacy's alarm.
LSA-R.S. 23:332 prohibits intentional discrimination on the basis of race, color, religion, sex or national origin.[4] Louisiana's anti-discrimination law is similar in scope to the federal statute prohibiting discrimination based on sex found in Title VII of the Civil Rights Act of 1964, at 42 U.S.C. § 2000e. Hanley v. Doctors Hosp. of Shreveport, 35,527 (La.App.2d Cir.6/6/02), 821 So.2d 508; Lebeaux v. Newman Ford, Inc., 28,609 (La.App.2d Cir.9/25/96), 680 So.2d 1291.
To prove a prima facie case for sex discrimination, a plaintiff must prove that: To establish a prima facie case for sex discrimination, the plaintiff must show: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she was discharged and (4) she was discharged because of her sex. Bauer v. Albemarle Corp., 169 F.3d 962 (5th Cir. 1999).
Once the plaintiff establishes a prima facie case of discrimination, the burden *243 shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's articulated reason is merely a pretext for discrimination. Id. Establishing a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
Thereafter, when all of the evidence has been presented, the overall evidence ultimately must be sufficient for the jury to conclude that sex discrimination was the true reason for the employment decision. To prevail in a disparate treatment case, a plaintiff must show that the protected trait actually motivated the employer's decision. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Thus, sex must actually have played a role in the employer's decision making process and had a determinative influence on the outcome. Id.
In the instant case, plaintiff, a female, is a member of a protected class. She suffered an adverse action by being demoted and later terminated. David Young, a male, was placed in the managerial position previously occupied by plaintiff. Infusion presented evidence that plaintiff was demoted because of the poor financial performance of the business and that she was terminated due to poor job performance. After reviewing the record, we find that, had the matter been pursued, a jury could have very well accepted plaintiff's version of the events leading up to her discharge and of Liew's attitude towards her. A jury could have determined that sex discrimination was the true motive of Infusion's decision to demote and later terminate plaintiff. Thus, it is possible that plaintiff could have prevailed on her sex discrimination claim, thus, there is a material issue of genuine fact and summary judgment is precluded.
Plaintiff's claim for sexual harassment is based upon statements allegedly made by Liew. During her deposition, plaintiff testified, "I felt like I was sexually harassed by the way that Eric Liew treated me," and added that Liew treated her "in a degrading manner." Plaintiff also testified that Young was "flirtatious, touchy" and he routinely made "kind of inappropriate comments." She stated that Young would often "allude to sexual innuendoes, flirtatious remarks about his other employees." She stated that during the last week of her employment with Infusion, Young commented about her clothing and asked her whether she had engaged in affairs with physicians in order to generate business for Infusion.
State law prohibits sexual discrimination and harassment in employment. LSA-R.S. 23:332 mirrors the federal statute, 42 U.S.C. § 2000e, et seq. Louisiana courts therefore look to the federal statute to ascertain the validity of a sexual harassment claim. Boudreaux v. Louisiana Casino Cruises Inc., 99-1168 (La.App. 1st Cir.6/23/00), 762 So.2d 1200, writ denied, 2000-2229 (La.10/27/00), 772 So.2d 651.
There are two types of sexual harassment: one based on quid pro quo theory and the other based on theory of hostile working environment. Spears v. Rountree Oldsmobile-Cadillac Co., 26,810 (La.App.2d Cir.4/5/95), 653 So.2d 182. Plaintiff's claim against Infusion was obviously based upon the latter.
To prevail in a sexual harassment claim based on a hostile work environment, *244 the plaintiff must prove (1) that he belongs to a protected class; (2) that he was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition or privilege of employment" and (5) that the employer either knew or should have known of the harassment and failed to take prompt remedial action. Whittington v. Kelly, 40,386 (La.App.2d Cir.12/14/05), 917 So.2d 688. Notably, for sexual harassment to be actionable, it must be "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Whittington, supra.
A sexual harassment claim, by its very nature, is very factual intensive. We have conducted a de novo review of the record, and again, we find that it is possible that a jury could have believed plaintiff's version of the events. Thus, a genuine issue of material fact exists and summary judgment is precluded.
Defamation
Plaintiff alleged that Liew and Young defamed her by making false statements about her job performance to physicians and other members of the medical community. Plaintiff argues that these statements negatively impacted her image in the medical community and affected her ability to gain other employment. Plaintiff also contends Liew alluded to others that plaintiff provided sexual favors in exchange for obtaining contracts on behalf of Infusion. Liew admitted during his deposition that he began searching for another pharmacist before plaintiff was demoted and terminated. He stated that he did discuss plaintiff with the persons he contacted, but he was not specific with regard to the statements he made.
To establish a claim for defamation, the plaintiff must show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to another; (3) fault on the part of the publisher and (4) injury. Kennedy v. Sheriff of East Baton Rouge, XXXX-XXXX (La.7/10/06), 935 So.2d 669.
As noted above, summary judgment is rarely appropriate for a determination of subjective facts such as motive, intent, good faith and knowledge. Subjective facts call for credibility evaluations and the weighing of testimony, and summary judgment is inappropriate for such determinations. Louisiana AG Credit, supra; Greer v. Dresser Indus., Inc., 98-0129 (La. App. 3d Cir.7/1/98), 715 So.2d 1235, writ denied, 98-2094 (La.11/6/98), 728 So.2d 867.
In the instant case, whether the alleged statements were false or whether the statements constituted "opinions," as urged by defendants, are questions for a jury to determine. Thus, we conclude that summary judgment was inappropriate.
Intentional Infliction of Emotional Distress
Plaintiff contends that she asserted a valid claim for intentional infliction of emotional distress based, in part, upon the comments made by Liew and Young. Plaintiff argues that the comments with regard to her performing sexual favors in order to secure contracts and their statements to others with regard to her job performance constituted extreme and outrageous conduct.
In White v. Monsanto Co., 585 So.2d 1205 (La.1991), the Louisiana Supreme Court explained that a plaintiff seeking damages for intentional infliction of emotional distress must prove: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe and (3) *245 that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."
In this case, the issues with regard to whether the conduct of Liew and Young was "extreme and outrageous," as well as whether they intended to inflict severe emotional distress or were substantially certain that emotional distress would follow, are factually intensive. We find that summary judgment was not the appropriate disposition of this matter.
Tortious Interference of a Contract
Plaintiff also contends Liew and Young tortiously interfered with her employment contract with Infusion by not allowing her to perform her marketing duties in an effort to generate more business for the company. We conclude that summary judgment is inappropriate for the disposition of the claim for tortious interference with a contract.
In 9 to 5 Fashions v. Spurney, 538 So.2d 228 (La.1989), the Supreme Court held that an action against a corporate officer for intentional and unjustified interference with contractual relations requires proof of the following:
1. The existence of a contract or a legally protected interest between the plaintiff and the corporation;
2. The corporate officer's knowledge of the contract;
3. The officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome;
4. Absence of justification on the part of the officer;
5. Causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
In the instant case, it is undisputed that a contract existed between plaintiff and Infusion, and Liew and Young had knowledge of the contract. Whether Liew and Young intentionally induced or caused Infusion to breach the contract or intentionally rendered the performance of the contract impossible or more burdensome, without justification, are questions of fact to be determined by a trier of fact. As stated above, summary judgment is rarely appropriate when subjective facts are at issue.

CONCLUSION
For the foregoing reasons, the summary judgment rendered in favor of defendants is hereby reversed and the matter is remanded for further proceedings. Costs of this appeal are assessed to the appellees, Kim Golden, the Law Firm of Shafto & Ashbrook and Michael Ashbrook.
REVERSED AND REMANDED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, GASKINS, CARAWAY and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] Plaintiff, James White, has been dismissed as a plaintiff and defendant, Stephen Harrison, has been dismissed as a defendant.
[2] Plaintiff alleged that Liew did not want her to attend the meeting because she was a woman.
[3] Liew's deposition testimony indicated that a home health nurse had complained that plaintiff had "mis-communicated" with the home health agency and had "mismanaged" Infusion supplies for a patient. Liew also testified that plaintiff caused the wrong medical supplies to be delivered to a patient, causing the home health agency to discharge the patient from Infusion's services. Liew further testified that Young had complained that plaintiff had left work one day without forwarding telephone calls to the answering service and without locking the pharmacy.
[4] LSA-R.S. 23:332 provides, in pertinent part:

A. It shall be unlawful discrimination in employment for an employer to engage in any of the following practices:
(1) Intentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin.
(2) Intentionally limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee, because of the individual's race, color, religion, sex, or national origin.