DREW, J.,
dissenting:
_JjThe majority fails to credit the three most important and explicit findings of the trial court that:
• a relation of confidence existed between Henderson and the defendants;
• the defendants misled[4] Henderson on numerous occasions; and
• Mecom and Gaylord were untruthful in their trial testimony.
The trial court acquitted itself brilliantly in handling this highly contested matter, rendering a decision amply justified by the record. The trial court’s opinion is annexed as an attachment and adopted in toto in this dissent.
Mecom and Gaylord befriended and wooed Henderson. He trusted them to his detriment. The defendants lied to him on numerous occasions, rewarding his trust by taking him to the cleaners.
These facts constitute the precise situation contemplated by La. C.C. art.1954.[5]
lüWhat the majority has done is substitute its judgment for that of the trial court, which heard it all and made firm and supportable conclusions based on the record.
Appellate courts often espouse in boilerplate that the rulings of trial courts are entitled to great weight, particularly as to credibility.
This case was a perfect storm by which to demonstrate that occasionally we mean what we say. Opportunity lost.
With respect, I dissent.
APPENDIX
HARRY SCOTT HENDERSON, ET AL VERSUS WTNDRUSH OPERATING CO., ET AL
NUMBER: 127,384 DIVISION: C
26th JUDICIAL DISTRICT COURT BOSSIER PARISH, LOUISIANA

^OPINION

FACTS

Petitioners, HARRY SCOTT HENDERSON and SHELLY LOU TALLEY HENDERSON brought this action against Defendants, WINDRUSH OPERATING CO., L.L.C. THOMAS S. GAY-LORD, MECOM OIL, L.L.C., JOHN W. MECOM, III, and JOHN H. HYATT, JR. on August 21, 2008. Petitioners own ap *299 proximately 800 acres of land in Bossier Parish, Louisiana, which they primarily use to grow hay and raise cattle. Mr. Henderson has had no experience in the oil and gas industry.
On February 28, 2005, Mr. Henderson granted a mineral lease on this land to Windrush Operating Company (later assigned to Mecom Oil, LLC) for a primary term of three years for $100 an acre covering 622 acres. Around February 2008, Petitioners and Defendants entered into a new lease and extended the original lease for two more years. Plaintiffs instituted this action claiming that Defendants fraudulently asserted rights they did not have under the prior mineral lease to obtain an extension of the existing lease and that the new lease should be rescinded for fraud.
According to testimony, Mr. Gaylord and Mr. Mecom began visiting Mr. Henderson on his farm in 2005. Both Mr. Mecom and Mr. Gaylord gave Mr. Henderson advice concerning his cattle operations and the prudence of going to a financial advisor. The parties discussed plans for the Henderson property, and Mr. Henderson testified that Mr. Gaylord helped him with business plans for the ranch. The parties discussed how much Mr. Henderson owed on his ranch, on his equipment, on cattle, and the probable return on the cattle. Mr. Mecom, Mr. Gay-lord and Mr. Henderson discussed starting a business wherein the parties n would be business partners in a saltwater disposal system. Mr. Henderson and his wife were invited to accompany Mr. Gaylord and his wife to Houston to watch a livestock show sometime between 2005 and February 2008.
According to testimony, during the three years that the original mineral lease was in effect between the parties, Harry Henderson, John Mecom and Thomas Gay-lord developed a close relationship. Mr. Mecom and Mr. Henderson spoke or the phone regularly and visited |4regularly at Mr. Henderson’s farm. Mr. Mecom advised Mr. Henderson on business plans for his haying business as well as advice about selling minerals. Mr. Henderson talked to Mr. Mecom about horses and cattle as Mr. Mecom’s family had horses. Mr. Gaylord used Mr. Henderson’s house as an office. Both Mr. Mecom and Mr. Gaylord visited with Mr. Henderson’s family on numerous occasions. Mr. Mecom, Mr. Gaylord, and Mr. Henderson went to dinners together and once, their wives joined them on a social trip to Texas. Mr. Henderson hosted a big cook-out for Mr. Gaylord and Mr. Mecom on his ranch.
According to testimony, Mr. Mecom and Mr. Gaylord used Mr. Henderson’s familiarity with the area to secure mineral leases from surrounding neighbors, which Mr. Henderson did as a friendly gesture. According to testimony, when Mr. Gaylord was unable to drive from Texas to Shreveport, he would ask Mr. Henderson to go to the court, file documents, and track down people in his stead. According to testimony, Mr. Henderson thought he, Mr. Me-com and Mr. Gaylord were “close friends” and trusted them as Mr. Mecom and Mr. Gaylord had been in the oil business all of their lives.
Mr. Mecom gave Mr. Henderson a check for $10,000 during Christmas, 2010 stating in a handwritten note “I truly appreciate your trust and enjoy our friendship ” [emphasis added]. This was six weeks before all of the parties met regarding the lease extension. Additionally, after signing the deal with Petrohawk, Mr. Mecom paid off Mr. Henderson’s $250,000 mortgage on the property, according to testimony. Mr. Mecom admitted that he felt he had a close relationship with Scotty Henderson when he gave him that gift and paid off his *300 mortgage because “he felt bad about the way things went down.”
In February of 2008, Mr. Henderson met with Mr. Mecom and Mr. Gaylord at Jack Binion’s Steak House to discuss renegotiating the lease. Unbeknownst to the defendants, Mr. Henderson’s friend, Larry Scott, was seated directly next to them and overheard their conversation. During this meeting, Mr. Henderson was told that the lease would be extended for another two years, and that he would receive an additional $90 an acre. According to testimony by Mr. Henderson, he was told by Mr. Mecom and Mr. Gaylord that the lease would be extended whether he agreed or not and the extension was due to a provision in the lease rider that permitted an extension even if the leaseholder did not wish to extend it. Mr. Henderson turned to Mr. Gaylord and asked if that was true. Mr. Gaylord said yes. When he asked his ■ friend Mr. Gaylord “If you can do it [extend the lease] without me, why pay me?” Mr. Gaylord told him |fi“man, take the money. It’s free money.” According to testimony, none of the parties brought a copy of the lease and thus Mr. Henderson was unable to examine the phrase the Defendants claimed could extend his lease with or without his consent. Mr. Henderson later signed the lease, and stated but for his relationship with Mr. Mecom and Mr. Gaylord, he would not have signed it.
Following this meeting, Mr. Henderson and Mr. Scott discussed the lease. Mr. Scott told Mr. Henderson that he didn’t trust the defendants but Mr. Henderson would hear none of it. They also discussed the two-year extension and Mr. Henderson expressed dismay at being required to extend the lease. Mr. Henderson and Mr. Gaylord also had several conversations regarding “the two-year extension” clause that was in the contract. Mr. Gaylord explained that he was sorry that there was confusion but failed to unearth the truth of the matter.
According to testimony, unbeknownst to Mr. Henderson, there was no two-year extension clause. The clause in controversy was in fact the Pugh clause and reads as follows:
“Two years after the expiration of the primary term, unit operations or production shall maintain the lease only within the geographical boundaries of such unit or units and only as to all formations from the surface of the ground down to the stratigraphic equivalent of the deepest depth drilled and logged by Lessee in said- unit well, and the lease, as to all areas outside of the geographical boundaries of and as to all lower formations within such unit or units shall ipso facto cease, terminate and be forfeited without notice, demand or putting in default, provided, however, that if the said unit well is drilling at the expiration of the primary term, such drilling operations shall continue the lease within the geographical boundaries of the said unit or units in full force and effect as to all depths until such drilling and logging operations are concluded, at which time the lease shall ipso facto cease, terminate and be forfeited without notice, demand or putting in default as to all formations below the stratigraphic equivalent of the deepest depth drilled and logged in said unit well.”
Nowhere in this clause does it authorize an extension of the lease term without the leaseholder’s consent.
The parties worked up a lease amendment pursuant to their conversation at Jack Binion’s in February 2008. In it, the parties removed the phrase “Two years” from the Pugh clause. Importantly, they *301 added a provision that did permit a lease extension. It states:
“Lessee is hereby given the option to extent [sic] the primary term of the Lease covering all or any portion of the Leased Premises for an additional period of two (2) years from expiration of the extended primary term on February 28, 2010. If such option is exercised, the primary term of the Lease shall then be extended until February 28, 2012. As consideration of the grant of such option, Lessee, on or before February 28, 2010, shall send to Lessor a check calculated by multiplying the acres selected by Lessee for extension times a bonus consideration of $200.00 per net mineral acre. Failure to exercise such option on or before February 28, 2010, or make the payment of bonus consideration as hereinabove provided, shall result in the termination of the Lease as to all lands, |6depts.., And formations not theretofore included within a producing unit as more specifically provided for in the Lease as amended hereby.”
This is the only clause that would permit a lease extension that the Defendants insisted was permissible; importantly, it was only enacted after the Defendants managed to extend the lease against Mr. Henderson’s desires.
After the lease extension was signed, Mr. Henderson ate with Mr. Gaylord in approximately March 2008. He was told by Mr. Gaylord “something is up” but was not told what that statement was in reference to. No additional wells were drilled on his property, and the two that were already drilled on the Henderson property were not producing. Mr. Henderson later learned that the “something that was up” was the Haynesville Shale. The extended lease was resigned in February 2008. Mr. Meeom assigned the Henderson lease in
April 2008 to Petrohawk. The February 2008 lease was assigned to Petrohawk Energy Corporation for $6,750 per acre.
Robert McGowen, an expert in Petroleum Analysis, testified as an expert for Plaintiffs. He testified that Haynesville Shale wells were permitted from as early as 2006. There were reports on the Haynesville Shale area along with wells being drilled prior to February 2008. The knowledge of the shale was known for years but the technology required to develop them was slow to be developed. However, in 2002, the Barnett Shale was discovered and developed and the same technology was used on the Haynesville Shale. Mr. McGowen also testified that based on the information available, future development of Cotton Valley wells on the Henderson’s property would not be feasible and no marketable production was reached or had been reached on Cotton Valley Formations in this general area.
Mr. Henderson contends that defendants Gaylord and Mecom fraudulently misled him into signing the amendment extending the term of the lease. Mr. Henderson bases this claim on theories of fraud and a cultivation of a relation of confidence created between the parties pursuant to Civil Code Article 1954. As support, Mr. Henderson explains that the defendants had known of the existence and availability of the Haynesville Shale formation under the lands of petitioners and others in this area since at least 2007. He asserts defendants also knew that neither petitioners nor the general public in northwest Louisiana were aware of the Haynes-ville Shale until March 2008. Mr. Henderson contends that defendants Me-com and Gaylord misrepresented to petitioners during their negotiations that the cause of defendants’ interest in |7the amendment was to explore the Cotton Valley formation, never revealing to petition *302 ers that their true cause was to explore the Haynesville Shale formation. Even witnesses that testified for the Defendants stated the existence of the Haynesville Shale has been known for over fifty years. An email between David Nini, a seller of oil and gas properties, and Steve Herod of Petrohawk, from April 16, 2008 discusses Mr. Mecom and states “[h]e has been watching the buzz around the Haynesville play and has heard the acreage bonus being paid. It’s got his attention and he is wanting to sell his leases.”
Defendants, on the other hand, claim that there was no misrepresentation that was the basis for extending the lease. They contend that they had no duty to disclose the Haynesville Shale lode and that Plaintiffs must prove that they had a duty to speak or disclose information to prove the elements of fraud.

Discussion

An allegation of fraud contains three basic elements: “1) a misrepresentation, suppression, or omission of true information, 2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another, and 3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim’s consent to the contract.” Skannal v. Bamburg, 44,820 (La.App.2 Cir.1/27/10), 33 So.3d 227, 237. Further, “fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. However, this exception does not apply when a relation of confidence has reasonably induced a party to rely on the other’s assertions or representations.” Id. In order to rescind a contract based on fraud, the petitioner must prove that 1) there was a misrepresentation by the defendants, 2) there was an intent to obtain an unjust advantage, 3) the misrepresentation related to a circumstance significantly influencing the victim’s consent, and 4) there was a relation of confidence.
Defendants contend that Plaintiffs must prove a duty to speak or disclose information. Since this is a claim based on the misrepresentation of the truth, not fraud based on silence or suppression of the truth, the Defendant’s claim has no merit. See Skannal, 33 So.3d. at 237. As a side note, Defendants attempted to make a great deal of argument about continuing operations continuing the lease. The Court finds this argument unpersuasive.

18Analysis

This Court finds there was a misrepresentation by Defendants. Mr. Henderson had multiple conversations with the Defendants regarding what he believed to be the lease extension option, beginning with the dinner at Jack Binion’s. Every time Mr. Henderson brought up the “lease extension,” Defendants failed to explain that the Pugh clause does not authorize the lease extension of two years. According to testimony, at the dinner, Mr. Mecom told Mr. Henderson that there was a clause in the lease that gave them the option to extend the lease for two years even if Mr. Henderson did not want to extend the lease, and Mr. Gaylord told Mr. Henderson that was true.
Mr. Henderson later told Mr. Gaylord that he wanted to remove that clause so in the future he wouldn’t be required to extend the lease for two more years without his consent. In response, defendants drafted a lease amendment. In this amendment, Paragraph K was added to include “Lessee is hereby given the option to extent [sic] the primary term of the Lease covering all or any portion of the Leased Premesis for an additional period of two (2) years from expiration of the extended primary term on February 28, *303 2010.” Furthermore, the lease amendment eliminated the words “Two (2) years” from the rider in the Pugh clause apparently to comply with Mr. Henderson’s wishes. Mr. Gaylord failed to explain the true nature of the clause at this time and instead added in the very provision that Mr. Henderson was trying to remove.
Finally, after his lease was assigned to Petrohawk, Mr. Henderson spoke with Mr. Gaylord again to remove the purported two-year option from the contract. Mr. Gaylord again failed to explain the true nature of the clause and in fact told him that there was no way to avoid the two-year option. Mr. Gaylord told him that he was sorry about the way things went down, but there was nothing he could do about it now. Through all of these conversations, Defendants actively misrepresented the true nature of the Pugh clause when they knew (or should have known, based on their repeated conversations about the exact same subject) that Mr. Henderson would not have understood it on his own.
The numerous conversations that the parties had regarding the lease, as well as the lease amendment created in February 2008, leads this Court to find that the defendants actively misrepresented the purpose of the Pugh clause. Further, Mr. Mecom and Mr. Gaylord were very evasive in answering questions regarding these negotiations when questioned in court. Mr. 19Mecom was impeached on the stand regarding a previous case against him for fraud. The court, in looking at Mr. Me-com and Mr. Gaylord’s demeanor as they testified, finds their testimony untrustworthy.
The second element is the intent to obtain an unjust advantage. Civil Code Article 1957 permits fraud being proved through circumstantial evidence, and White v. Golden states that circumstantial evidence is usually necessary for proof of motive or intent (White v. Golden, 43,076 (La.App.2 Cir.4/30/08), 982 So.2d 234, 241). See also Louisiana AG Credit, PGA v. Livestock Producers, Inc., 42,072 (La. App.2 Cir.4/4/07), 954 So.2d 883, 891 (the trier-of-fact must weigh competing inferences when evaluating circumstantial evidence of proof of motive and it is not appropriate for a summary judgment ruling).
Here, the defendants extended the lease while misrepresenting the Pugh clause, giving Mr. Henderson no real opportunity to oppose the extension. In testimony at trial, Mr. Mecom and Mr. Gaylord both told Mr. Henderson they could extend the lease without his permission based on continuing operations. Both stated they did not need Mr. Henderson’s permission but it would be a cleaner transaction to get an extension of the lease. Defendants offered Mr. Henderson an additional S90 dollars an acre as a form of compensation, even though Mr. Henderson correctly pointed out at the dinner meeting that since they didn’t need his consent, they didn’t need to give him ' any extra compensation. Mr. Henderson questioned why he would be given extra compensation if the lease could be extended without his permission. According to testimony, Mr. Gaylord told Mr. Henderson to take the money as it was free.
When Mr. Henderson spoke to Mr. Gay-lord and Mr. Dardeau after he extended the lease, he was told “something is going on, and we can’t tell you about it right now.” Defendants then failed to develop the land any further under the existing lease and sold the amended lease to Petro-hawk for $6,750 an acre a mere two months after the extension. Defendants received in excess of 50 times the amount they paid Mr. Henderson by assigning *304 these leases to Petrohawk — a very healthy profit for less than two months work.
This court finds it difficult to believe that a multi-million dollar company would deliberately extend a lease and contract to build a third well on property that had two previous non-producing wells. Mr. Mecom is a fourth-generation oil man. This court also finds it difficult to believe that this same company would find this property so alluring that the president of the company would fly out to a farm that occupied less than one square mile to acquire a 110mineral lease worth only $190 an acre. Mr. Mecom’s company put down the last deposit on a drilling rig in 2008. This rig was never built, and the company lost over one million dollars on the rig. There is no reason that such a profitable company would invest this much money into land that was not providing them with a profit unless there was an ulterior motive. Plaintiffs expert Robert McGowen clearly showed that Haynesville Shale wells were being produced beginning in 2006 and reports on the shale were being circulated prior to February 2008. Mr. McGowen also showed that there would be no feasible reason to continue producing the Cotton Valley wells that Defendants currently had on Mr. Henderson’s property. All the circumstances surrounding this transaction show the court there was an intent to obtain an unjust advantage by obtaining the lease extension.
The third element, the misrepresentation related to a circumstance significantly influencing the victim’s consent, is met. The misrepresentation of the Pugh clause was the only reason that Mr. Henderson signed the lease extension and gave his consent, Mr. Henderson had no desire to extend the mineral lease and did everything in his power to remove the clause that he thought was forcing his hand. Mr. Henderson trusted Mr. Mecom and Mr. Gaylord to such an extent that testimony shows he relied on their statements. In fact, testimony by Mr. Gaylord shows that Mr. Henderson had to be forced to accept the extra $90 dollars an acre. Mr. Mecom and Mr. Gaylord, through their visits, money, and trips, have circumstantially shown that their actions significantly influenced the plaintiffs consent. In fact, testimony shows that Mr. Henderson went against his own brother-in-law in stating that Mr. Mecom and Mr. Gaylord were truthful regarding leasing agreements. Testimony showed that Mr. Henderson defended Mr. Mecom and Mr. Gaylord as being honest, to the extent of losing a relationship with his brother-in-law.
The fourth and final element Plaintiffs must prove is a relation of confidence between the parties. Under Civil Code article 1954, Mr. Henderson would not be able to prove a fraud claim but for the relation of confidence. Mr. Henderson could have obtained the truth behind the matter without difficulty or special skill. He could have hired a lawyer to look over the contract and examine the two-year clause that plagued him, and it probably would not have been difficult to do so.
However, this Court finds that there was a relation of confidence between the parties, and Mr. Henderson’s fraud claim therefore stands. The parties all admit to being friends. Mr. h Henderson and Mr. Gaylord went to dinners together and their wives dined together as well. Mr. Mecom gave Henderson incredibly valuable gifts far beyond those that lessors and lessees give each other ($10,000 at Christmas and $250,000 to pay the mortgage off on his property). Mr. Gaylord also had Mr. Henderson go to the court and file documents without compensation, get his neighbors to agree to mineral leases, and he and Mr. Henderson spoke often on the *305 phone regarding the well development on his property. Mr. Henderson often asked Mr. Mecom about aspects of business and drilling, which Mr. Mecom explained to him. Mr. Henderson’s brother-in-law once called the defendants crooks, but Mr. Henderson would not hear it and he took Mr. Mecom and Mr. Gaylord’s side. Mr. Mecom sat in the truck at the Henderson property, discussing with Mr. Henderson plans about wells and future business together. These activities and responses go well beyond a normal lessor-lessee relationship.
Courts appear to use a case-by-case method when determining relationships of confidence. Opposing litigants do not have relations of confidence (Homer Nat. Bank v. Nix, 566 So.2d 1071 (La.App. 2 Cir. 1990)), and surgeons and professional mentors do not have such relations of confidence (Gamer v. Hoffman, 638 So.2d 324 (La.App. 4 Cir.1994)). However, a family-friend-turned-Husband’s-attorney did have a relationship of confidence with the wife (Perot v. Perot, 71 So.3d 1123 (La.App. 2 Cir.2011) 46,431. Following Perot,) it would make sense that a friend/lessor would have a relationship of confidence just like a friend/attorney would.
Accordingly, this Court finds that there was a relation of confidence between the parties that would negate Mr. Henderson’s duty to unearth the truth of the matter relating to his fraud claim. Defendants actively misrepresented the true purpose of the Pugh clause and attempted to institute another lease extension to use in the future. Defendants did so knowing that the Haynesville Shale lode was adjacent to this property, that Petrohawk was a willing buyer, and that the Hendersons were unaware of this lode. David Nini’s email to Petrohawk clearly states Mr. Mecom knew of the Haynesville Shale, knew what he had, and was anxious to close a deal. But for the misrepresentation, Mr. Henderson would not have signed the lease extension. Circumstances indicate a great reason to induce Mr. Henderson to get a deal done. Therefore, for the foregoing reasons, the lease extension signed in February 2008 is hereby RESCINDED.
|12Court costs are to be paid by the defendants.
Benton, Louisiana this 28th day of September, 2011.
HON. JEFF COX DISTRICT JUDGE
PLEASE SERVE:
Joseph A. Gregorio, Sam Gregorio, Roy Payne
1100 Benton Road Bossier City, LA 71111 Attorneys for Plaintiff Glenn L. Langley 401 Market Street, Suite 600 Post Office Box 59 Shreveport, LA 71161-0059 Attorney for Defendants
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, CARAWAY, DREW and GARRETT, JJ.
Rehearing denied.
DREW, J., would grant rehearing.

. Four examples, three of which were outlined in the trial court’s opinion:
(1) At the dinner, Mecom told Henderson that a clause in the lease allowed a two-year extension, without Henderson’s consent, a lie flatly backed up by Gaylord;
(2) Henderson requested that the fictitious two-year extension be removed from the extension he signed in February of 2010 and the defendants agreed; instead, an actual two-year extension was added to the 2010 extension;
(3) Post-extension, Gaylord actively misrepresented the true nature of the original Pugh Clause in telephone conversations with Henderson; and
(4) Perhaps the most obscene example of chicanery occurred when Gaylord told Henderson over the phone that it was a shame that Henderson had no leverage over PetroHawk, by which to help Henderson negotiate some surface accommodations, and, by the way, please go ahead and sign the assignment to PetroHawk, which was "only a formality."
The lying never stopped.

. Art.1954. Confidence between the parties
Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.
This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other’s assertions or representations. (Emphasis added.)