568 So.2d 160 (1990)
Charles N. BELL, Jr., et al., Plaintiffs/Appellees,
v.
E. Felton VICKERS, et ux., Defendants/Appellants.
Nos. 21759-CA to 21761-CA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 1990.
*161 Davenport, Files & Kelly by Thomas W. Davenport, Jr., Monroe, for plaintiffs/appellees.
Kidd & Kidd by Paul Henry Kidd, Monroe, for defendants/appellants.
Before MARVIN, FRED W. JONES, Jr. and SEXTON, JJ.
*162 FRED W. JONES, Jr., Judge.
In these consolidated actions involving the enforcement of a guarantee and indemnification agreement and the collection of promissory notes arising out of the formation and liquidation of a corporation, defendants, Felton and Betty Vickers, appealed judgments in favor of plaintiffs, J.W. and Alvena Johnson and Charles and Judith Bell. Finding no error, we affirm.

Issues Presented
On appeal defendants present the following assignments of error:
1) The trial court erred in failing to include defendants' requests for certain interrogatories;
2) The trial court erred in failing to submit any special interrogatory on defendants' primary defense and principal cause of action, fraud in the inception, to the jury; and,
3) The trial court erred in denying defendants' motion for judgment notwithstanding verdict and/or alternatively motion for a new trial.

Factual Context
This complex factual litigation arises from the formation of a corporation, Mid-South Power Equipment, Inc. (Mid-South). It was incorporated in October 1980 by Charles Bell, J.W. Johnson, Robert Hansbrough and Edward Brown for the purpose of sales of lawn and garden equipment. Hansbrough had been a sales representative in the wholesale distribution of lawn and garden products and was to be the key manager. On December 19, 1980 the four original incorporators obligated themselves to First National Bank of West Monroe (First National Bank) to obtain for the corporation a letter of credit in the amount of $100,000 in favor of Coleman Company, Inc., a supplier of Mid-South. The letter of credit was obtained by the four incorporators executing a $1,000,000 chattel mortgage on all of the inventory of Mid-South and by their personal guarantees. The letter of credit was not listed as a liability on Mid-South's financial statements. On March 25, 1981 the four incorporators executed a guarantee agreement in favor of Simplicity Manufacturing, another supplier. As of May 31, 1981 Mid-South owed Coleman Company a sum in excess of $100,000 under the letter of credit issued by First National Bank. On June 1, 1981 Coleman drafted $63,797.22 against the $100,000 letter of credit pursuant to an agreement between Coleman and First National Bank. This draft reduced Mid-South's obligation to Coleman as of June 30, 1981 to $50,215.56. To cover this draft payment to Coleman a note for that amount was executed in favor of First National Bank on June 10, 1981 and was signed by Bell and Brown on behalf of Mid-South. The note was secured by the four incorporators' personal guarantees and the $1,000,000 chattel mortgage on the inventory.
In early July 1981 Hansbrough discussed with the Vickers their possible purchase of Mid-South stock. The Vickers were neighbors and Mr. Vickers became interested in the corporation after seeing some of the equipment at Hansbrough's home. Mrs. Vickers had previously worked with Hansbrough. Hansbrough set up a meeting at the office of Harvey Marcus, the corporate accountant, for the Vickers to discuss the purchase. After his meeting with the Vickers, Hansbrough discussed with the other stockholders the Vickers' interest in purchasing stock and all of the stockholders agreed the Vickers would have to personally endorse the obligations of Mid-South as a prerequisite to the purchase. After further negotiations in which the Vickers were shown the financial statements of the corporation, allegedly advised it was in good financial condition and a good investment, they purchased $50,000 of stock on July 14, 1981. The stock was purchased using funds that Mrs. Vickers had received in life insurance proceeds after the death of her first husband. The Vickers contended that at the time of purchase they were not informed about the $100,000 letter of credit issued in favor of Coleman Company nor were they told the June 30, 1981 financial statement of the corporation which they had examined did not include the $63,800 note to First National Bank. Further, there were no disclosures made to them at *163 this time about the other stockholders' intent to have them personally endorse the obligations of the corporation.
At the end of July 1981 Betty Vickers went to work for Mid-South as bookkeeper and "Girl Friday". In this capacity Mrs. Vickers began to receive notices of notes payable to First National Bank at the end of August 1981. Mrs. Vickers found that one of the notices from First National Bank was for a note in the amount of $63,800 for which Mid-South had no ledger entry. She checked the financial statements for the six months ending June 30, 1981 and discovered the note was not listed. After discovering the omission of the note from the financial statement, the Vickers allegedly demanded to get their money back from their investment but without success. The evidence indicates the omission of this note from the financial statement which was shown to the Vickers prior to their investment was simply a clerical error.
The stockholders of the corporation had a meeting on September 17, 1981 at which a resolution was passed directing the Vickers to sign personal guarantees for the corporate debts of Mid-South. The need for additional capitalization of the corporation was discussed as operations had begun with less than the required projected capital. The minutes of the meeting reflect that in Hansbrough's opinion, additional capital contributions of at least $100,000 needed to be made within the next year. Mrs. Vickers was elected treasurer of the corporation and to the board of directors.
Hansbrough and Brown later desired to terminate their stock ownership in Mid-South since they were concerned with its financial condition and wanted to limit their liability to corporate creditors arising from the guarantee agreements they had signed. Hansbrough wanted to leave management of the corporation as he felt the stockholders, primarily the Vickers, had lost confidence in him. The parties agreed Hansbrough could sell his stock to Mid-South for $1 and the remaining parties agreed to hold him harmless and indemnify him from any liability arising under guarantee agreements. The parties also agreed Brown could sell his shares of stock to the corporation for $1 and his liability under the guarantee agreements would be limited to $17,500. Two separate acts of sale of corporate stock were executed on September 3, 1982. The acts of sale specifically provided that the agreements terminated and replaced a guarantee and indemnification agreement executed by the shareholders on December 1, 1981. That previous guarantee and indemnification agreement had provided that the entities covered thereby were First National Bank, Louisiana Bank and three suppliers of equipment and had been signed by Felton Vickers.
On the same date the acts of sale were executed, the parties signed a new guarantee and indemnification agreement whereby they apportioned among themselves their solidary liability to corporate creditors in proportion to their new stock ownership interest. After the purchase of Hansbrough and Brown's shares, the Bells owned 40% of the outstanding stock, the Vickers 40% and the Johnsons 20%. Therefore, the agreement provided that the guaranteed corporate debts and liabilities would be borne by the parties in this proportion. Although it appears the possibility of liquidation of the corporation was discussed during this period of time, the parties elected to continue operations.
As the corporation continued to need further capitalization defendants invested an additional $10,000 and Johnson and Bell each invested $35,000 on September 15, 1982. Mid-South issued a $35,000 note to Johnson, which note was endorsed by Bell and Betty Vickers. Mid-South also issued a $35,000 note to Bell which was endorsed by Johnson and Betty Vickers and a $10,000 note to Betty Vickers which was endorsed by Bell and Johnson. On September 28, 1982 Mid-South issued a $15,000 note to Bell which was personally endorsed by Johnson and Betty Vickers. On September 29, 1982 Mid-South issued a $11,500 note endorsed by Bell and Betty Vickers. The note was later made payable to Johnson. On February 16, 1983 Mid-South issued a note for $12,912.83 payable to Bell *164 which was endorsed by Betty Vickers and Johnson.
Eventually, despite the efforts of the parties, the condition of the corporation did not improve and liquidation was undertaken. The parties believed the corporation failed due to a combination of factors such as high interest rates and the poor economy which forced the bankruptcy of many small lawn and garden retailers during this period of time. When called upon to make their proportionate payments the Vickers were unable to do so. Fearing they would be unable to meet their financial obligations under the September 3, 1982 guarantee and indemnification agreement, defendants asked the Bells to meet those obligations for them. To secure their debt to the Bells defendants executed a collateral mortgage note, a collateral mortgage and a limited pledge agreement on April 25, 1983. The collateral mortgage note for $33,000 was secured by a mortgage on the Vickers' home and pledged to secure the liability of the Vickers to the Bells that would result from the Bells' personal payment to First National Bank of any portion of the Vickers' share of the corporate debt due the bank in accordance with the guarantee agreement. First National Bank later made demand upon Mid-South for the payment of the balance due on the corporate promissory note and the proportionate liability of the Vickers was paid by the Bells.
On January 17, 1984 plaintiffs, the Bells and the Johnsons, filed suit No. 84-176 naming as defendants the Vickers. In their petition, plaintiffs alleged defendants were indebted to the Bells for $28,065.04 and to the Johnsons for $10,627.78. Plaintiffs contended the parties were owners and stockholders of Mid-South and on September 3, 1982 had entered into a guarantee and indemnification agreement under which terms the Bells, Johnsons and Vickers obligated themselves to pay certain percentages of the obligations of the corporation in the event they were called upon to do so by the corporate creditors. At all times creditors of the corporation included Simplicity Manufacturing, Inc. and First National Bank and the obligations of the corporation to these creditors were specifically considered to be within the scope of the guarantee agreement. Plaintiffs alleged on November 10, 1983 Simplicity gave notice that the debt secured by the personal guarantee was due and payable in the amount of $56,223.49, which amount was discounted to $53,138.94. Plaintiffs asserted they had made demand upon defendants for payment of their proportionate share of this obligation and defendants refused to comply. On November 21, 1983 Simplicity was paid $31,883.36 by the Bells and $21,255.58 by the Johnsons. Thus, defendants were indebted to the Bells for $10,627.79 and to the Johnsons for $10,627.78. On November 14, 1983 the promissory note executed by the corporation in favor of First National Bank was due. Once again plaintiffs made demand upon defendants to pay their proportionate share in compliance with the guarantee agreement, which demand was refused. The corporate obligation of the corporation in the amount of $43,593.16 was paid in full by the Bells on December 2, 1983. Of this indebtedness 40% or $17,437.26 was due and owing by the defendants. Plaintiffs further alleged that on April 25, 1983 the Vickers had executed a collateral mortgage note and act of collateral mortgage encumbering real estate owned by them and then entered into a limited pledge agreement whereby defendants pledged to the Bells the mortgage note secured by the act of mortgage. Pursuant to the limited pledge agreement, the Bells paid First National Bank $17,437.26 which was actually due by defendants following the non-payment of defendants of their 40% share of this obligation. The Bells alleged defendants were indebted to them in this sum under the collateral mortgage note and limited pledge agreement and prayed that the act of collateral mortgage be recognized and made executory.
Defendants filed an answer and reconventional demand, essentially alleging they were induced to sign the guarantee agreement by the fraudulent and false misrepresentations of the plaintiffs, including the threat they would lose their initial investment *165 of $50,000. Thus, the agreement was legally unenforceable. Further, defendants alleged they were induced to execute the collateral mortgage and collateral mortgage note under threats and false misrepresentations and those documents were legally unenforceable. In their reconventional demand, defendants contended they were induced into making their initial investment by the intentional concealment of a debt of the corporation, the $63,800 note to First National Bank, and were not allowed to return their stock upon their discovery of this fact. Defendants claimed had that obligation been included in the financial statement, it would have shown the corporation to be insolvent and they would not have invested their $50,000 in the corporation. Defendants further alleged they were threatened with the loss of their stock and investment if they did not make further investments in the corporation and did not execute certain agreements. Further, Betty Vickers was induced to co-sign two notes and defendants were induced into giving a mortgage on their home. Finally, defendants contended that plaintiffs had generally mismanaged the corporate affairs, despite their protests.
On August 7, 1987 J. W. Johnson filed suit No. 87-2969 naming the Vickers as defendants. Plaintiff alleged he was the holder in due course and/or payee of two promissory notes issued, made and endorsed by Betty Vickersone note for $35,000 dated September 15, 1982 and one note for $11,500 dated September 29, 1982. Plaintiff alleged no payments had been made on these notes. On that same date Charles Bell filed suit # 87-2970 naming the Vickers as defendants, alleging he was the holder in due course and/or payee of three promissory notes issued, made and endorsed by Betty Vickersone note for $35,000 dated September 15, 1982, one note for $15,000 dated September 28, 1982 and one note for $12,912.83 dated February 16, 1983. Plaintiff alleged no payments had been made on these notes. The trial court consolidated the three separate suits for trial.
Defendants filed an answer to these suits alleging the new suits were simply a different theory to collect the original claim and once again alleging false and fraudulent misrepresentations as well as failure of consideration for the notes. Defendants also filed reconventional demands and cross-claims against Bell, Johnson, Hansbrough and Brown.
After a trial, the jury found in favor of plaintiffs in Suit No. 84-176, holding that the evidence did not prove fraud was practiced by the Bells or Johnsons in inducing the Vickers to sign the guarantee and indemnification agreement or the collateral mortgage note, collateral mortgage and limited pledge agreement. The jury awarded the Johnsons $18,250 and the Bells $26,456.41. In Suit Nos. 87-2970 and 87-2969 the jury found the evidence did not establish that the Bells and/or Johnsons had practiced fraud upon the Vickers in order to induce Mrs. Vickers to endorse the various promissory notes. In Suit No. 87-2969 judgment was entered in favor of plaintiff, Johnson, and against defendants for $17,500 with an additional judgment of $5750. The defendants were ordered a credit or off-set of $5000. In Suit No. 87-2970 judgment was entered in favor of plaintiff, Bell, and against defendants, for $17,500 with additional judgments of $7500 and $6456.42. It was further ordered that defendants were entitled to a credit or off-set of $5000. In Suit No. 84-176 there was judgment entered awarding plaintiffs the amount set by the jury and the collateral mortgage was ordered recognized and made executory to the extent of $17,437.26, together with interest and attorney's fees. The reconventional demands of the Vickers were dismissed in all three actions.
The defendants filed a motion for judgment notwithstanding verdict/alternatively motion for a new trial, alleging the jury misunderstood defendants' contentions because the interrogatories to the jury were not consistent with the court's charges, specifically defendants' claims as to fraud in the inception. Defendants asserted there should have only been one set of interrogatories because the notes sued upon were debts of the corporation and the indemnification agreement covered the respective *166 liabilities of the parties. The trial court denied defendants' motion for a new trial and ordered that judgment notwithstanding the verdict be entered only in Suit No. 84-176 to amend the judgment by reducing the award in favor of the Johnsons from $18,250 to $10,627.78.

Special Interrogatories
In brief, defendants' primary argument is that the trial court omitted their defense and principal cause of action, fraud in the inception in that the Vickers were fraudulently induced to purchase the stock, from the special interrogatories that were presented to the jury. Defendants note there were special interrogatories as to fraud in the execution of certain notes and documents but not one special interrogatory on fraud in the inception, which resulted in an erroneous verdict.
Counsel for defendants states that the issue of jury instructions and special interrogatories was discussed in a late chambers conference the evening before closing arguments. Counsel contended there was never any dispute between the parties as to whether defendants' claim for fraud in the inducement would be included in the special interrogatories to be submitted to the jury. The jury instructions were being typed during counsel's closing arguments and the special interrogatories were furnished just before the conclusion of those arguments. Counsel alleges that since there was no problem with the jury instructions, he assumed the special interrogatories were consistent with the trial court's jury instructions and was not aware of the content of the special interrogatories until the jury returned its verdict. Counsel notes he specifically limited his closing arguments to the theory of fraud in the inception and yet there were no special interrogatories on this theory in each of the cases but rather the inclusion of special interrogatories which were inconsistent with the jury instructions. Due to the omission of the principal cause of action and defense from the special jury interrogatories accompanied by conflicting jury instructions, and because of the alleged contradictory awards of the jury, defendants contend this court cannot give the usual weight to the jury's findings but rather must review the evidence and render a proper judgment in accordance with the applicable law.
Pursuant to the Code of Civil Procedure and the jurisprudence, the trial court has the discretion to submit a case to the jury on special interrogatories but is not required to do so. The trial court has broad discretion to submit and frame interrogatories to the jury. Failure to raise a timely objection to jury interrogatories at trial precludes that party from raising that issue on appeal provided the parties were given an opportunity to object. Egan v. Hullinghorst Industries, Inc., 537 So.2d 1226 (La.App. 4th Cir.1989); Levet v. Calais & Sons, Inc., 514 So.2d 153 (La.App. 5th Cir.1987); Bechtel v. Entringer Bakeries, Inc., 422 So.2d 1299 (La.App. 5th Cir. 1982); Williams v. City of Alexandria, 376 So.2d 367 (La.App. 3d Cir.1979), writ denied, 378 So.2d 432 (La.1979), and Corceller v. Brooks, 347 So.2d 274 (La.App. 4th Cir.1977), writ denied, 350 So.2d 1223 (La. 1977).
The record reflects and defendants' counsel admits in brief that he made no objection to the form of the special interrogatories before they were submitted to the jury. Counsel further admits he did not read the final form of those interrogatories before their submission to the jury. Therefore, defendants' objection to the absence of a special interrogatory on the theory of fraud in the inception was not timely made and may not be made on appeal. In any event, the omission of the special interrogatories requested by defendants would have been harmless error since defendants failed to meet their burden of proof as to fraud in the original sale of the stock.
Fraud is a misrepresentation or supression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud need only be proven by a preponderance of the evidence and may be established by circumstantial evidence. The party alleging fraud has the burden of proving it. Highly suspicious facts and circumstances surrounding *167 a transaction are proper considerations in determining whether fraud has been committed. Fraud is never presumed. C.C. Arts. 1953 and 1957. First National Bank v. Campo, 537 So.2d 268 (La.App. 4th Cir. 1988), writ denied, 538 So.2d 578 (La.1989); El Paso Exploration Company v. Olinde, 527 So.2d 511 (La.App. 1st Cir.1988); Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2d Cir.1987), writ denied, 506 So.2d 1231 (La.1987); Home Indemnity Company, Inc. v. Boe, 499 So.2d 1301 (La. App. 4th Cir.1986), and Mitchell v. Bertolla, 397 So.2d 56 (La.App. 2d Cir.1981), writ denied, 400 So.2d 669 (La.1981).
The financial statement shown to the Vickers prior to their investment omitted the $63,800 debt to First National Bank but the testimony established that this omission was merely an inadvertant clerical error or oversight which was not intended by the other incorporators to defraud the Vickers into making the original purchase of the stock. Although this omission from the financial statement was significant, the evidence does not support defendants' contentions it was of such importance that they would not have purchased the stock had they known of this debt. The defendants learned of the omitted debt approximately one month following the purchase. If it had been of such significance to them, they could have attempted to rescind the sale by appropriate legal action at that time. The fact that the Vickers failed to take immediate legal action to rescind the sale but instead continued to fully participate in the daily operation and management of the corporation for well over a year after the discovery of the omission constitutes convincing evidence that the inaccuracy of the financial statement was not of sufficient importance to defendants to substantially influence their consent.
While the Vickers testified they immediately demanded back their initial investment of $50,000 from the other stockholders upon learning of the $63,800 debt, this was contradicted by the testimony of the other stockholders. Further, the Vickers invested an additional $10,000 in the corporation in September 1982 and signed personal guarantees of the corporate debts. They also executed a $33,000 collateral mortgage to secure their obligation pursuant to the guarantee and indemnification agreement. The evidence established Betty Vickers went to work for the corporation at the end of July 1981 shortly after their investment and had full access to the financial records of the corporation as well as check signing authority. Mrs. Vickers also served as the treasurer and on the board of directors of the corporation. Considering the extremely active role of the Vickers in the direct day-to-day management of the business subsequent to their initial investment, the jury reasonably concluded the Vickers were not fraudulently induced to invest in the corporation and then coerced and threatened into further participation and investment. Obviously, that long-term participation in the management of the business indicates defendants were voluntary participants, even after learning of the erroneous financial statement.
The defendants also contend they were threatened and coerced into signing the guarantee and indemnification agreement and promissory notes which form the basis for these actions. The jury's responses to the special interrogatories on these issues demonstrate it rejected these allegations of threats or coercion. We find no error in that finding of fact. The overwhelming import of the testimony indicates that the Vickers were voluntary participants in this corporation and knowingly and willingly joined in the efforts to salvage the business by the execution of various documents, even when liquidation was freely discussed and two other stockholders had elected to withdraw from the corporation.

Motion for a New Trial/Judgment Notwithstanding Verdict
As we have found no error in the jury verdict on the issues of fraud in the inception in the original purchase of the stock and fraud in execution of the guarantee and indemnification agreement and promissory notes, we find the trial court did not abuse its discretion in refusing to grant *168 defendants' motion for a new trial/judgment notwithstanding verdict.

Decree
For the reasons stated herein, the judgments in favor of plaintiffs are AFFIRMED at defendants' costs.