MOORE, J.
| jDennis and Margie Bamburg appeal a judgment which nullified four contracts with their former business partner, the late John C. Skannal, and awarded damages and attorney fees. After a 16-day trial, the district court found that out of nine contested contracts entered between 1996 and 2004, four — exclusive right to sell agreement (10/9/03), act of sale of membership interest in Sligo Hills LLC (2/27/04), act of sale of common stock in Sligo Enterprises Inc. (3/2/04), and mineral deed with assignment of leases (3/2/04) — occurred when Skannal lacked mental capacity to enter business transactions owing to alcohol-induced dementia, Alzheimer’s disease and prostate cancer. The court also found that Skannal was “under the influence of Dennis Bamburg.” For these reasons the court declared the contracts null. By a supplemental opinion, the court further found that Dennis Bamburg’s dealings with Skannal constituted fraud, entitling Skannal’s succession to a penalty of 25% of the purchase prices and attorney fees. By a second supplemental opinion, the court set attorney fees and fixed costs.
The court rendered judgment which (1) nullified the four contracts, (2) ordered Skannal’s succession to restore the purchase prices of $843,752, (3) ordered the Bamburgs to pay damages of $307,315 for fraud, attorney fees of $500,000, and costs, and (4) ordered incidental relief not contested on appeal.
The Bamburgs have appealed, raising five assignments of error. For the reasons expressed, we reverse the denial of the exception of no right of action, without prejudice. To reflect this change, the judgment will be amended and affirmed. Skannal’s succession has answered the appeal,J^seeking additional attorney fees; this will be denied.

Factual Background

Skannal owned a large tract of land called Sligo Plantation (said to have been in his family since the 1840s) in south Bossier Parish where he ran a livestock operation but primarily lived off his oil and gas royalties. He was retired from the state police and still was a notary public. A host of witnesses described him as reclusive, asocial, a chronic alcoholic and generally unpleasant person. Although many said he was miserly and loath to part with any of his assets, in the mid-1970s he was trying to sell a country lot on Skannal Road when he met the Bamburgs. Dennis was an Air Force vet working as a ticket agent for Delta Airlines when he called Skannal about buying the lot. The Bam-burgs bought it and moved their mobile home there.
According to the Bamburgs, Skannal wanted more than just a neighbor; he wanted a business partner. At Dennis’s suggestion, they formed a corporation to develop part of Skannal’s land into a 148-unit mobile home park called Plantation Acres. A few years later they formed another corporation, Sligo Enterprises Inc., to develop a tract that Skannal’s father had subdivided but never completed, Shadow Ridge. Dennis was president, Skannal vice-president, and Margie secretary-treasurer. In both these companies, Skannal contributed the land and the Bam-burgs the “sweat equity,” and each held *231 50% of the capital stock. For many years Skannal voiced no objection to this business model, and apparently both projects were financially successful.
|aIn the early 1990s, Skannal’s marriage ran aground; his wife moved out while he was at a ham radio convention in Texas, and at least two of his three children sided with their mother. This resulted in a long period of estrangement which, according to the succession, isolated Skannal and accelerated his drinking. Also, it meant that Skannal’s immediate family were not able to provide any insight into his thoughts, motives and mental status from about 1992 on.
In the mid-1990s, Skannal and the Bam-burgs entered into a series of contracts to develop a large tract of Skannal’s land into a golf course with an adjacent subdivision called Olde Oaks. Several different agreements were involved. Initially, Skannal contributed the land, some 332 acres with a reservation of mineral rights, and the Bamburgs paid cash for the equivalent value, $154,750, and each received an equal number of additional shares in Sligo Enterprises Inc.
In February 1999, Skannal and Dennis formed another business, Sligo Hills LLC, to facilitate the project further. As before, Skannal put in a large amount of land (according to the petition, over 1,300 acres, virtually the last remnant of Sligo Plantation, but with a reservation of minerals) and the Bamburgs put in a promissory note for $533,000 (which they and Skannal agreed was an equivalent value), for a 50% interest each in the LLC.
Around this time, Skannal was diagnosed with inoperable prostate cancer. He enrolled in an experimental treatment program at the Feist-Weiller Center at LSU Health Sciences Center from January 2000 through February 2003, under the direction of Dr. Richard Mansour, who saw him |4regularly for these critical three years. Dr. Mansour found him to be a compliant patient who seemed to understand the nature of the experimental program.
Other witnesses, however, described a man in rapid decline, physically and mentally. His office in the old plantation store was unkempt and littered with mounds of beer cans and bourbon bottles. Another person with whom Skannal did business, a fertilizer salesman named Jimmy Pete Burks, testified that by 2003 Skannal’s farm was a shambles. Burks began to assist him with the farming operation, and brought him liquor anytime he wanted it. One day in August 2003, Burks found him flat on his face in the flowerbed, seriously drunk and injured in the fall. Skannal had to be hospitalized, first at Highland Hospital, then at LifeCare, and then at the psychiatric ward of Promise Hospital, where a geriatric psychiatrist, Dr. Keith Kessel, described him as delusional and combative. Dr. Kessel testified that he phoned Skannal’s daughter, Elizabeth, to advise that in his current state, Skannal could be interdicted. Elizabeth testified that she conveyed this information to Dennis, but she never took any action to interdict her father.
For several years, the Municipal Police Employees Retirement System (“MPERS”) had been seeking to diversify its portfolio by acquiring real estate, particularly golf courses. According to MPERS’s chairman, Bill Fields, Skannal (a retired state policeman) had always been eager to sell, and on two occasions had literally flagged down his red patrol car to press the issue, but Dennis was holding out. In 2000, MPERS bought a portion of | fithe property for $6.5 million, but when the project foundered, MPERS escalated its requests in the belief that additional land for the surrounding subdi *232 vision would help the golf club. After long negotiations between Dennis and MPERS, Sligo Enterprises agreed to sell the remaining property for $4.544 million. Skannal and the Bamburgs both pocketed $2.1 million from the deal, making Sligo Enterprises even more lucrative than their prior ventures. At the closing on February 13, 2004, nobody from MPERS suspected that Skannal was an assisted living patient with multiple forms of dementia. The court did not rescind any of the MPERS contracts.

The Nullified Contracts

On October 9, 2003, while Skannal was still in the psychiatric ward at Promise Hospital, Dennis brought him a document, “Exclusive Right to Sell Agreement,” whereby Sligo Enterprises granted Dennis the exclusive right to sell corporate property at a 10% commission. Skannal and Dennis both signed this. When Sligo Enterprises later sold its property to MPERS, Bamburg paid himself a commission of $449,400 pursuant to the exclusive right to sell agreement, the first transaction nullified by the court.
After Skannal was discharged from Promise Hospital on October 13, 2003, Burks resumed carrying him liquor. Burks testified that at Skannal’s direction, he sold off the remainder of Skannal’s cattle. He also testified that around this time, Skannal was earning $40,000 to $70,000 a month in mineral royalties. Burks admitted skimming off some of this money for his personal use, as did Elizabeth.
| (¡Skannal was again hospitalized from January 14 to February 10, 2004, after which Dennis moved him to The Arbor, an assisted living center. While he was living at The Arbor, he signed the three other contracts ultimately nullified by the court.
According to the Bamburgs, after the golf course deal was completed, Skannal wanted to convert his assets to cash. On February 27, 2004, Dennis drove him to the office of real estate attorney Jeff De-Laune, who had handled several of the parties’ transactions. Using information supplied by Dennis, DeLaune drew up a two-page “Act of Sale of Membership Interest in Sligo Hills, LLC” whereby Skan-nal sold his remaining 50% interest in the LLC to the Bamburgs for $400,000, which Skannal received by check and deposited. DeLaune, his wife, and Janelle Ward, the notary, all testified that Skannal chatted with them about the business climate in Bossier, especially the riverboats, where Skannal had become a frequent patron, often losing thousands of dollars a night on the slots. These witnesses described a man perfectly aware of what the sale purported to do. They were not aware that he was in an assisted living center or diagnosed with dementia, and they agreed that no separate counsel was present to explain the deal to him. This was the second contract the court nullified.
Four days later, on March 2, 2004, Dennis again drove Skannal to DeLaune’s office, where DeLaune had drawn up two documents based on information provided by Dennis. The first was a two-page “Act of Sale of Common Stock of Sligo Enterprises Inc.” whereby Skannal sold his remaining 2400 shares of the company to the Bamburgs for $323,752, |7which Skannal received by check and deposited. Second was a two-page “Mineral Deed with Assignment of Leases” whereby Skannal sold the naked ownership of all his mineral interests to the Bamburgs for $120,000, which Skannal received by check and deposited. The mineral deed was subject to Skannal’s lifetime usufruct. Ms. DeLaune notarized these acts; as on the prior occasion, she and the witnesses testified that Skannal appeared sober and sentient, but they were unaware of his medical condi *233 tion, and there was no other attorney present to advise him separately. These were the other two contracts nullified by the court.

Subsequent Events and Procedural History

After these events, Skannal’s health deteriorated rapidly. Jimmy Pete Burks was bringing him liquor all the time, and the staff at The Arbor reported that Skan-nal was usually drunk and ornery, fell down frequently, and could not control his bowels. Because drinking was against The Arbor’s regulations, Dennis moved him to Garden Court, where the situation continued. In moments of apparent lucidity, however, he began telling Burks that “they” had robbed him blind and that he had nothing left. By “they,” he meant the Bamburgs. Burks relayed this information to Elizabeth, who contacted her two brothers, A.C. and Barron. The children then revived a relationship with their moribund father, and in March 2005 they took him to attorney John Odom’s office and painted the whole scenario.
On March 14, Skannal filed this suit to rescind his contracts with the Bamburgs, dating back to 1999, on grounds of incapacity, error, fraud and | Jesion. Skannal died in November 2005, and his son Barron (an undertaker in Texas), the succession representative, was substituted as plaintiff.
By amended petitions, the succession added contracts dating back to January 1996 and demanded damages for fraud. A prodigious course of discovery and pretrial motions ensued. Of relevance to the appeal was the Bamburgs’ exception of no right of action, contending that as to the exclusive right to sell agreement, the succession had no right or cause of action to assert the claims of the corporation, Sligo Enterprises Inc. The court sustained this exception prior to trial.

Overview of Trial Testimony and Action of District Court

After a daylong Dauberl hearing, the trial took 16 days from March to July 2007. The succession presented several medical experts. Dr. Ronald Goebel, a clinical neuropsychologist, and Dr. Keith Kessel, a geriatric psychiatrist, had examined Skannal at LifeCare and Promise Hospital, respectively, in late 2003 through mid-2004. They diagnosed neurological deficits, a reduced IQ of 80, and alcohol-related dementia. Dr. Kessel had suggested interdicting Skannal. Dr. Marjorie Fowler, the pathologist who performed Skannal’s autopsy, confirmed that he had Alzheimer’s disease and widespread pros-tatic cancer.
The succession also presented the testimony of four medical experts, psychiatrist Dr. Paul Ware, forensic psychiatrists Dr. Richard Williams and Dr. George Seiden, and general practitioner Dr. David T. Henry, each of whom examined Skannal one time shortly before his death. To compensate for the obvious lack of patient time, these doctors reviewed two volumes of | ¡¡medical records, depositions and interviews that ran to nearly 8,000 pages. A fifth medical expert, geriatric and forensic psychiatrist Dr. Bennett Blum, of Tucson, Arizona, never saw Skannal but dilated on his teaching tool for gauging undue influence. These experts held the unanimous view that from about 1997 on, Skannal was so afflicted with alcohol-induced dementia, vascular dementia, Alzheimer’s disease and prostate cancer that he could not possibly understand any complex business transaction. They further expounded that even though Skannal might not have been drunk on a given day, the dementia and incapacity were present at all times. They added that during sober intervals, a patient like Skannal would not appear impaired to anyone but a highly skilled foren *234 sic psychiatrist. They also concluded that because of his cancer and isolation from his family, Skannal was particularly susceptible to influence from Dennis, who had been his trusted business associate for over 20 years. They reviewed statements from many, but by no means all, persons who dealt with Skannal in his fading years.
The Bamburgs called one expert psychiatrist, Dr. James Phillips, who never examined Skannal but reviewed the medical records. He concluded that Skannal suffered from very mild vascular dementia, mild alcoholic dementia, and no clinical symptoms of Alzheimer’s disease. He agreed that Skannal had borderline dementia and did poorly at LifeCare, and was still in a diminished state when admitted to Promise Hospital, but improved dramatically by the end of his stay in October 2003. He felt that Skannal had complete mental capacity in February and March 2004.
The Bamburgs also called Dr. Ted Warren, a family practitioner in 110Bossier City, and Dr. Dennis Venable, a urologist at LSU Health Sciences Center, who testified that in their treatment of Skannal, they never had any concerns about his competency. Dr. Venable added that in July 2003, during the experimental treatment program at Feist-Weiller, Skannal had elected intermittent self-catheterization, a process requiring a certain level of understanding and skill.
Another major portion of expert testimony came from appraisers, economists and CPAs. Much of their testimony addressed the fiscal soundness of contracts Skannal executed between 1996 and 2002, not nullified by the court and not issues on appeal. There were diverse opinions of the value of Skannal’s 50% interest in the closely held corporation and LLC; the succession’s experts felt these were worth much more than the Bamburgs paid for them in 2004, while the Bamburgs’ experts testified that both companies did remarkably well (26% annual return over nearly 30 years), and that across the life of the companies both sides received equivalent value.
These experts also disputed the value of the naked ownership of Skannal’s mineral rights. After years of depressed natural gas prices, in the early 2000s these wells began paying him an average of $60,000 per month. The succession’s petroleum engineer, Henry Coutret, testified that the standard multiplier for selling interest in a producing well is 30-60 times its monthly income, but he had never heard of a sale in which the vendor reserved all income for life. The Bamburgs’ CPA, John Walter Dean, testified that Skannal received this much in royalties between the date of the |nsale and his death.
The district court rendered a 19-page opinion restating and largely adopting the •view of the succession’s medical experts but finding that Skannal’s dementia did not render him incapacitated until October 2003 and late February to early March 2004. The court further found, “as a matter of law,” that Skannal was “under the influence of Mr. Bamburg,” but not Ms. Bamburg, and set aside the four contracts listed above. The court specifically declined to nullify five other contested contracts.
On Odom’s motion, the court issued a supplemental opinion stating that “the previous factual findings” also supported a finding that Dennis committed fraud with respect to the four nullified contracts. The court assessed a penalty of 25% of the purchase price of the stock in Sligo Enterprises Inc., the interest in Sligo Hills LLC and Skannal’s mineral rights. Finally, the court acknowledged that prior to trial it had sustained the Bamburgs’ exception of no right of action as to the exclusive right *235 to sell agreement. The court stated, however, that at trial the Bamburgs failed to object to the admission of this document, thus expanding the pleadings, and the court now felt that its prior ruling was in error, so this contract would also be nullified.
After a hearing on costs, the court issued a third opinion fixing costs, including medical expert witness fees of $86,500 (instead of the nearly $200,000 they billed), and attorney fees of $500,000 (instead of the $986,866 demanded).
The judgment nullified the four contracts, directed the succession to |12restore the purchase price of $843,752, and ordered the Bamburgs, in solido, to pay a penalty of $307,315 (including 25% of the purchase price of the acts of sale and mineral deed, and one-half of the real estate commission paid under the exclusive right to sell, an item not mentioned in the supplemental opinion), expert costs of $95,486, and attorney fees of $500,000.
As noted, the Bamburgs have appealed, contesting (1) the finding that Skannal lacked capacity to contract, (2) the finding that the Bamburgs committed fraud, (3) the finding that the Bamburgs exerted undue influence over Skannal, (4) the denial of the exception of no right of action, and (5) the finding that Ms. Bamburg was liable for the fraud committed by her husband. The succession has answered the appeal, seeking additional attorney fees of $68,635.99 for post-trial and appellate work.

General Principles

The standard of appellate review for factual determinations is the manifest error-clearly wrong standard, which precludes setting aside a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Rando v. Anco Insulations Inc., 2008-1163 (La.5/22/09), 16 So.3d 1065, and citations therein. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently. Id. Moreover, when expert witnesses express differing views, the trier of fact must determine which is more credible. Id.

11SDiscussion: Lack of Capacity

By their first assignment of error, the Bamburgs urge the court was manifestly erroneous to find that Skannal lacked capacity to engage in routine business transactions. They show that under La. C.C. art. 1918, only “persons deprived of reason” lack capacity to contract; they contend that the court applied too high a standard, relying on the succession’s suggestion that Skannal could sign a contract only if he had been sober for weeks, had independent counsel, and somebody first read the document to him. They urge the proper standard is clear and convincing evidence of lack of capacity. Meadors v. Pacific Int’l Petr., 449 So.2d 26 (La.App. 1 Cir.), unit denied, 450 So.2d 964 (1984). They argue, contrary to the defense experts’ wew, that Skannal was able to do many things, and do them well, after 1997. Finally, they urge that under La. C.C. art. 1926, a contract made by a noninterdicted person may be attacked after his death, on grounds of incapacity, only when the contract is gratuitous, evidences lack of understanding, or was made Avithin 30 days of death. They submit that the succession’s claims were raised after Skannal’s death and meet none of the criteria of art. 1926.
The succession responds that under the manifest error standard of review, considering the voluminous evidence in the entire record on which the court based its *236 ruling, the finding should be affirmed. It contends the expert testimony overwhelmingly proved that Skannal suffered from alcohol dementia, vascular dementia and Alzheimer’s disease, and these conditions deprived him of reason. It submits that the court carefully weighed the | uevidence, as it refused to nullify the contracts executed before 2001, and reasonably resolved the conflicting claims.
All persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting. La. C.C. art. 1918. The presumption is that all persons have capacity to contract; lack of capacity must be shown by clear and convincing evidence. Succession of Hollis, 43,315 (La.App. 2 Cir. 6/18/08), 987 So.2d 387, writ denied, 2008-1632 (La.10/24/08), 992 So.2d 1035. A contract made by a person without legal capacity is relatively null and may be rescinded only at the request of that person or his legal representative. La. C.C. art. 1919. A noninterdicted person, who was deprived of reason at the time of contracting, may obtain rescission of an onerous contract upon the ground of incapacity only upon showing that the other party knew or should have known that person’s incapacity. La. C.C. art. 1925. Succession of Hollis, supra.
The succession correctly shows that the expert evidence addressing Skan-nal’s capacity was voluminous; this court cannot belabor the detailed, prolonged and often repetitive testimony of Drs. Ware, Williams, Seiden, Henry and Phillips. It is sufficient to say that the succession’s experts felt that Skannal lacked capacity from about 1997 on, while the Bamburgs’ expert felt he retained reasonable capacity until the summer of 2004. Burks became Skannal’s gofer and booze runner sometime in 2002, carrying him copious amounts of alcohol that he quaffed daily, as confirmed by photos of Skannal’s office and by numerous lay witnesses. Burks also testified that by | iBthis time, Skannal’s farm was a shambles. We further note that for years, Skannal had kept a meticulous journal of temperature, rainfall, and financial matters, noting the sale of every calf and the outcome of every trip to the Bossier City casinos, but the journal appears to have ended in 2002. Skannal was a patient at Promise Hospital on October 9, 2003, when he signed the exclusive right to sell agreement, and a resident of The Arbor on March 2, 2004, when he signed the act of sale of common stock and the mineral deed with assignment of leases.
Admittedly, the record presents factual anomalies that are difficult to reconcile. Bill Fields testified that Skannal twice flagged down his patrol car to badger him about the MPERS deals; Dr. Venable testified that in mid-2003, Skannal showed sufficient understanding to elect self-cath-eterization; the notaries, attorneys and witnesses present when Skannal signed the nullified acts all felt that he appeared feeble and somewhat immobile, but was cogent and well informed. Robert Cock-rell, the investment counselor at Morgan Stanley, where Skannal deposited nearly $3.5 million in proceeds from the deals with the Bamburgs in early 2004, understandably thought there was nothing wrong with his client’s mind. All these facts show a man in reasonable possession of his faculties.
Moreover, we would almost agree with the Bamburgs that the succession set the standard unreasonably high for proving capacity. If any contract could be nullified because one party was drunk the previous day, or because no independent counsel was present to advise the party and read the document to him before signing, then virtually all real estate, auto and 1 ^securities transactions would be vulnera *237 ble. Skannal, however, was amply shown to be a special case, diagnosed with multiple forms of dementia, prostate cancer, and falling-down drunk almost daily.
Even with the anomalies so ably urged by the Bamburgs, the record is sufficient to establish by clear and convincing evidence that Skannal suffered from multiple forms of dementia, prostate cancer and habitual drunkenness that deprived him of reason at certain times. On this immense and difficult record, we cannot say the district court was plainly wrong in finding that Skannal lacked contractual capacity on October 9, 2003, February 27, 2004, and March 2, 2004, when these transactions were executed.
Finally, we note that Skannal filed this suit before his death, so the limitations of La. C.C. art. 1926 do not apply. This assignment does not present reversible error.

Fraud

By their second assignment of error, the Bamburgs urge the court erred as a matter of law in finding that fraud was proved in any of the challenged transactions. They contend that under La. C.C. art. 1953, the first element of any action for fraud is a misrepresentation, suppression, or omission of true information, and that in this enormous record “plaintiff failed to articulate any instance of misrepresentation by Bamburg to Skannal.” They argue that all contracts were reduced to writing, the Bamburgs paid every dollar and fulfilled every promise, and the succession produced no evidence that they ever lied to Skannal.
117The succession responds that the proper standard for reviewing a finding of fraud is manifest error. Chambers v. Kennington, 35,079 (La.App. 2 Cir. 9/28/01), 796 So.2d 733. It contends that because of their relation of confidence, Skannal had no duty to ascertain the truth of any representations the Bamburgs may have made to him. La. C.C. art. 1954. It argues that even without evidence of specific statements, fraud may be proved by “highly suspicious facts and circumstances surrounding a transaction.” Bell v. Vickers, 568 So.2d 160 (La.App. 2 Cir.1990). It concludes that on this record, the finding of fraud was not plainly wrong.
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. C.C. art. 1953. The basic elements of an action for fraud against a party to a contract are (1) a misrepresentation, suppression or omission of true information, (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another, and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim’s consent to the contract. Shelton v. Standard/700 Associates, 2001-0587 (La.10/16/01), 798 So.2d 60. Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. However, this exception does not apply when a relation of confidence has reasonably induced a party to rely on the other’s assertions or representations. La. C.C. art. 1954. When a claim of fraud is based on silence or suppression of the |18truth, the plaintiff must prove a duty to speak or to disclose information. Greene v. Gulf Coast. Bank, 593 So.2d 630 (La.1992). Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. La. C.C. art. 1957; Succession of Hollis, supra.
*238 The succession correctly shows that the standard of review of a finding of fraud is manifest error. Mayfield v. Reed, 43,226 (La.App. 2 Cir. 4/30/08), 981 So.2d 235; Lafayette Ins. Co. v. Pennington, 42,-434 (La.App. 2 Cir. 9/19/07), 966 So.2d 136. Also, the succession correctly shows that a duty of full disclosure arose from the parties’ relation of confidence, their work together in numerous business ventures over a 25-year period. Notably, Skannal was usually the “silent” partner, providing the real estate and relying on information from the Bamburgs, who performed the physical element of development and sales.
As with the lack of capacity, this record provides a long procession of facts for and against the finding of fraud. The Bamburgs correctly show that for each of the annulled transactions, they paid and performed precisely as stated in the contract; that not one shred of testimony directly implicates them in a misrepresentation or suppression of the truth; and that because of the parties’ long and lucrative business association, Skannal may have intended to treat them more favorably than an arm’s-length buyer. On the other hand, the Bamburgs, more than anyone, knew or should have known of Skan-nal’s deepening cognitive deficits, chronic alcoholism, and dependence on them. Moreover, the absence of direct proof of fraud likely results more from Skannal’s dementia than from the purity of the Bam-burgs’ 119statements to him. The whole course of events in late 2003 and early 2004 can equally well be viewed as an elaborate scheme to “clean the man out” before his death or interdiction.
Most impressive to this court is the gross inequity of the annulled contracts, particularly the mineral deed with assignment of leases. Henry Coutret, the succession’s expert petroleum engineer, testified that mineral rights usually sell for 30 to 60 times their monthly production, and the sale price of $120,000 was less than 10% of fair market value. He had never heard of a sale of the naked interest only, reserving usufruct to the seller. The Bamburgs’ CPA and expert in business valuation, John Walter Dean, testified that he would have used a multiple of 24, by which a fair market value was $1,133,000; even though the Bamburgs paid only $120,000, Skannal received royalties of $1,391,987 between March 2003 and his death in 2005, meaning he ultimately got a fair market value. Counting royalties from lessees as part of the purchase price is, in our view, a misleading inducement. The district court was entitled to find that this deal was so peculiar and unfavorable to Skannal that it could not have occurred in the absence of fraud.
The district court was not plainly wrong to find that Dennis Bamburg committed fraud to obtain an unfair advantage over Skannal. This assignment does not present reversible error.

Undue Influence

By their third assignment of error, the Bamburgs urge that the court’s finding that Dennis Bamburg unduly influenced Skannal is legally flawed |Mand manifestly erroneous. They show that under La. C.C. art. 1479, “influence” is a ground for revoking a donation inter vivos or mortis causa, and not for rescinding an onerous contract. This article also requires proof that the influence “so impaired the volition of the donor as to substitute the volition of the donee * * * for the volition of the donor.” They contend that the evidence shows only that Skannal relied on their advice, which had been sound and lucrative for over 20 years, but that the irascible and determined Skannal never allowed anyone to usurp his own volition. They also show that the succession’s own expert, Dr. Seiden, testified that Skannal was *239 “vulnerable” to coercion, but declined to state that he was actually coerced.
The succession does not directly address the Bamburgs’ construction of Art. 1479, but urges that the evidence was sufficient to support the finding of undue influence.
For the reasons already discussed, this court has affirmed the findings of lack of capacity and fraud, both of which would result in the rescission of the affected transactions. La. C.C. arts. 1919, 1958. With due respect to the Bamburgs’ articulate argument, we conclude that even if the finding of undue influence were legally wrong, reversing it would not result in reinstating the affected transactions. We therefore pretermit this issue. We would only note that despite the literal language of Art. 1479, courts have applied the concept of undue influence to a marriage contract, Brumfield v. Brumfield, 477 So.2d 1161 (La.App. 1 Cir.1985), writ denied, 479 So.2d 922 (1985), and stated in dictum that it applied to “a deed or a contract,” Mitchell v. Bertolla, 340 So.2d 287 (La.1976). This assignment does not |21present reversible error.

Liability of Ms. Bamburg

By their fifth assignment of error, the Bamburgs urge the court erred as a matter of law in rendering a money judgment against Margie Bamburg. They argue that the spouse of a fraudulent tortfeasor is not liable for her husband’s offense by virtue of the marriage unless she authorized him to perform the act in question or unless he was attending to a community mission. First State Bank & Tr. Co. v. Fireman’s Fund Ins. Co., 399 So.2d 729 (La.App. 1 Cir.1981). They submit that merely classifying the obligation as community should not result in liability to Ms. Bamburg.
The succession responds that under La. C.C. art. 2360, an obligation incurred “during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse” is a community obligation. Ms. Bamburg benefited financially from the contracts and hence was liable for damages for fraud.
An obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse is a community obligation. La. C.C. art. 2360. Except for separate obligations delineated in La. C.C. art. 2363, all obligations incurred by a spouse during the existence of the community regime are presumed to be community obligations. La. C.C. art. 2361. An obligation resulting from a spouse’s intentional wrong not perpetrated for the benefit of the community is a separate obligation. La. C.C. art. 2363; Succession of LeBlanc, 577 So.2d 105 (La.App. 4 Cir.1991).
|220n this record, the district court was entitled to apply the presumption of Art. 2361: there is no evidence that the community did not benefit from her husband’s dealings with Skannal, and much evidence to show that she was almost an equal participant in their business ventures. Even if Ms. Bamburg did not know that her husband’s conduct was fraudulent, she is liable for the community obligation. Lafayette Ins. Co. v. Pennington, supra; Gardes Directional Drilling v. Bennett, 2001-0080 (La.App. 3 Cir. 6/6/01), 787 So.2d 1201, writ denied, 2001-1991 (La.10/26/01), 799 So.2d 1154; Succession of LeBlanc, supra. This assignment does not present reversible error.

Exception of No Right of Action

By their fourth assignment of error, the Bamburgs urge the court erred as a matter of law in declaring the October 9, 2003, exclusive right to sell agreement null. They show that the court had already *240 ruled, on their exception of no right of action, that this was a derivative claim which belonged to the corporation, not to Skannal personally. La. C.C. art. 24; Glod v. Baker, 2002-988 (La.App. 3 Cir. 8/6/03), 851 So.2d 1255, writ denied, 2003-2482 (La.11/26/03), 860 So.2d 1135. They urge that they were not on notice that the issue was still before the court at trial, and the court’s action violated the law of the case. Day v. Campbell-Grosjean Roofing, 260 La. 325, 256 So.2d 105 (1972).
The succession responds that despite the court’s pretrial ruling on the exception, the exclusive right to sell agreement was placed in evidence without objection; hence, the pleadings were expanded to incorporate the | tissue. La. C.C.P. art. 1154. The succession also submits that the parties extensively argued and briefed the exclusive right to sell, thus negating any claim of surprise.
Only a person having a real and actual interest to assert may bring an action. La. C.C.P. art. 681. The peremptory exception of no right of action tests whether the plaintiff has a legal interest in judicially enforcing the right asserted. La. C.C.P. art. 927 A(6); Taylor v. Dowling Gosslee & Asso., 44,654 (La.App. 2 Cir. 10/7/09), 22 So.3d 246. It questions whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit. Louisiana Paddlewheels v. Louisiana Riverboat Gaming Com’n, 94-2015 (La.11/30/94), 646 So.2d 885. Whether a plaintiff has a right of action is a question of law that is subject to de novo review. Taylor v. Dowling Gosslee & Asso., supra, and citations therein.
The personality of a corporation is distinct from its members. La. C.C. art. 24. Only the corporation, not its members, may sue to recover any damages it has sustained. Taylor v. Dowling Gosslee, supra. A shareholder has no separate or individual right of action against third persons for wrongs committed against or damaging to the corporation. Glod v. Baker, supra. This same rule applies even where one person may be the sole shareholder. Mente & Co. v. Louisiana State Rice Milling Co., 176 La. 476, 146 So. 28 (1933); Taylor v. Dowling Gosslee, supra; Palowsky v. Premier Bankcorp Inc., 91-0059 (La.App. 1 Cir. 3/6/92), 597 So.2d 543. A person who does business in corporate form and reaps the benefits of incorporation cannot j^sue individually for damages incurred by the corporation. Taylor v. Dowling Gosslee, supra; Glod v. Baker, supra.
Unlike the Bamburgs’ other assignments, this issue is subject to de novo review. Taylor v. Dowling Gosslee, supra. The Bamburgs correctly show that the exclusive right to sell agreement was executed by the corporation, Sligo Enterprises. Bamburg and Skannal signed in their official capacities as president and vice-president, respectively. The right to rescind the agreement belongs to the corporation, not to an individual shareholder or officer. Taylor v. Dowling Gosslee, supra; Glod v. Baker, supra; Palowsky v. Premier Bankcorp Inc., supra. Neither the admission of this document into evidence nor the arguments of counsel altered the legal interest of the corporation to sue to nullify a corporate action. The evidence did not confer the right of action upon Skannal. This assignment of error has merit. The portion of the judgment nullifying the exclusive right to sell agreement will be reversed without prejudice.

Additional Attorney Fees

By answer to appeal, the succession seeks additional attorney fees of $68,635.99. In support, the succession at *241 taches the affidavits of its trial attorney, John S. Odom, Jr., claiming his time on the Bamburgs’ motion for new trial, several hearings on the suspensive appeal bond, a hearing to fix attorney fees, and preparation of the appellate brief. It asserts that the Bamburgs should “pay to play.” Vander v. Safeway Ins. Co. of La., 2008-888 (La.App. 3 Cir. 2/25/09), 5 So.3d 968.
| ¾/fhe party against whom rescission is granted because of fraud is liable for damages and attorney fees. La. C.C. art. 1958; Hickman v. Bates, 39,178 (La.App. 2 Cir. 12/15/04), 889 So.2d 1249. Factors to be taken into consideration in determining the reasonableness of attorney fees include (1) the ultimate result obtained, (2) the responsibility incurred, (3) the importance of the litigation, (4) the amount of money involved, (5) the extent and character of the work performed, (6) the legal knowledge, attainment and skill of the attorneys, (7) the number of appearances involved, (8) the intricacies of the facts involved, (9) the diligence and skill of counsel, and (10) the court’s own knowledge. Smith v. State, 2004-1317 (La.3/11/05), 899 So.2d 516; LSBA Rules of Prof. Conduct 1.5(a).
This court appreciates the extent and character of the work, including a day-long Daubert hearing, 16 days of trial with 59 witnesses, medical exhibits running to nearly 8,000 pages, and five post-trial hearings. The matter was herculean for all involved. It does not escape our notice, however, that the succession demanded nearly $1 million for its trial work, of which the district court awarded $500,000. The court apparently adjusted for the fact that of the many transactions litigated, only four were ultimately rescinded; notably, this court must reverse and remand one of those. We also find that much of the presentation was, to put it charitably, cumulative. Given the exceptionally large attorney fee already awarded, and the partial merit of the Bamburgs’ appeal, we do not find that an additional fee is warranted. The answer to appeal is denied.
| 2r Conclusion
For the reasons expressed, the judgment is affirmed insofar as it nullified the act of sale of membership interest in Sligo Hills LLC, the act of sale of common stock in Sligo Enterprises Inc., and the mineral deed with assignment of leases, all on grounds of Skannal’s lack of capacity and Bamburg’s acts of fraud; we also affirm the judgment insofar as it cast Ms. Bam-burg in judgment for damages related to fraud. However, as for the exclusive right to sell agreement, we sustain the Bam-burgs’ exception of no right of action and reverse that portion of the judgment without prejudice. Paragraph (1) of the judgment is hereby amended to fix the amount of penalty for fraud at $210,938, and paragraph (2) is amended to delete the exclusive right to sell agreement as a nullified contract. The judgment is in all other respects affirmed.
Costs of appeal are to be paid one-half by the succession and one-half by the Bamburgs.
REVERSED IN PART, AMENDED AND AFFIRMED. ANSWER TO APPEAL DENIED.