STEWART, J.
 

 hAt issue in this appeal is whether markers representing credit extended by the defendants, Eldorado Casino Shreveport Joint Venture, Eldorado Shreveport No. 1, and Eldorado Shreveport No. 2 (referred to collectively as “Eldorado”), to the plaintiff, Janis Strong (“Strong”), are enforceable. By summary judgment, the trial court concluded that the markers are enforceable and ordered Strong to pay the amount due plus damages, attorney fees, and costs as provided by La. R.S. 9:2782, totaling $190,600. Strong now appeals. Finding that there is no genuine issue of material fact and that summary judgment
 
 *970
 
 is appropriate as a matter of law, we affirm.
 

 FACTS
 

 On the night of August 12-13, 2009, Strong, a Texas resident and a longtime patron of Eldorado, a riverboat casino in Shreveport, Louisiana, executed three manual markers for $20,000 each (Markers No. 154990, 154991, and 154993), plus an additional marker for $12,000 (Marker No. 11470), for total credit of $72,000. While playing blackjack that night, Strong lost all the funds she had obtained on credit. That same night, Strong also cashed three checks totaling $60,000, and lost this amount as well. Thereafter, the three checks cleared Strong’s bank, but the markers, which Eldorado presented to Strong’s bank for payment on October 16, 2009, were returned marked “Not Sufficient Funds” (“NSF”). Eldorado pursued criminal charges based on the unpaid markers, and Strong was arrested in Cad-do Parish on December 22, 2009, for the charge of issuing worthless checks in an amount greater than $500.00.
 

 |2On January 14, 2010, Strong filed a petition for a declaratory judgment on the issues of whether she owes Eldorado the amount of the unpaid markers and whether the markers are unenforceable as gambling debts under La. C.C. arts. 2983 and 2984. Eldorado filed an answer and a reconventional demand for the amount of the outstanding markers plus damages of twice the amount owed, attorney fees, and court costs as provided under La. R.S. 9:2782 for NSF checks. Eldorado asserted that, as required by the NSF statute, it made written demand for payment via certified mail on January 28, 2009, and that more than 15 days had passed without Strong paying the amount due.
 

 On April 22, 2010, Eldorado filed a motion for summary judgment seeking the dismissal of Strong’s suit and the granting of its reconventional demand. Citing
 
 Players Lake Charles, LLC v. Tribble,
 
 00-1143 (La.App. 3d Cir.1/31/01), 779 So.2d 1058,
 
 writ denied,
 
 2001-0590 (La.4/27/01), 791 So.2d 118,
 
 Telerecovery of Louisiana v. Major,
 
 98-1192 (La.App. 1st Cir.5/18/99), 734 So.2d 947,
 
 writ denied,
 
 99-2293 (La.11/12/99), 750 So.2d 196, and
 
 Telerecovery of Louisiana v. Gaulon,
 
 98-1363 (La.App. 5th Cir.6/1/99), 738 So.2d 662,
 
 writ denied,
 
 99-1906 (La.10/8/99), 751 So.2d 224, Eldorado asserted that Louisiana courts have rejected the argument that markers are unenforceable gambling debts under La. C.C. arts. 2983 and 2984. Moreover, Eldorado asserted that the markers are to be treated as checks for purposes of the NSF statute as was done in
 
 Gaulon, supra.
 
 Eldorado offered in support of its motion the pleadings and the affidavit of its general manager, Michael Whitemaine, attached to which were copies of |athe markers, the demand letter, and the return receipt. According to Eldorado, the uncontested material facts that Strong executed the markers, that the markers were returned marked NSF when Eldorado attempted to negotiate them, that Eldorado made amicable demand for payment by letter of January 28, 2010, and that Strong has not tendered payment mandate summary judgment in its favor.
 

 Strong opposed summary judgment on five grounds. First, Strong argued that Texas law, which does not permit gambling on credit or the enforcement of debts arising from such actions, applies in this matter. Strong subsequently amended her petition and answer to Eldorado’s recon-ventional demand to assert this position.
 

 Although recognizing the precedent cited by Eldorado, Strong argued secondly that La. C.C. arts. 2983 and 2984 prohibit enforcement of the markers. Alternatively, she argued that these articles apply
 
 *971
 
 because the markers are illegal gambling debts due to Eldorado’s failure to follow its internal controls and the Louisiana Gaming Control Law, La. R.S. 27:1
 
 et seq.,
 
 in extending credit to her and in cashing her checks.
 

 Third, Strong argued that the markers are not checks, drafts, or negotiable instruments as defined by La. R.S. 10:3-104. Fourth, she argued that Eldorado presented the markers for payment before the date on which the parties agreed they were due. Strong contends that the markers are not enforceable under La. R.S. 9:2782 for both reasons. Fifth, Strong argued that Eldorado failed to follow the strict guidelines of La. R.S. 9:2782. ^Finally, Strong argued that disputed material facts as to all of these issues preclude summary judgment.
 

 Strong offered her affidavit, as well as the depositions of various Eldorado personnel, including Sharon Barnes, the Director of Compliance; Michael White-maine, the General Manager; Robert Urland, the Assistant General Manager; and Ian Cairns, the Director of Table Games. She also offered Eldorado’s internal controls and state law on credit play, check cashing, self-excluding and self-limiting, and compulsive gambling along with records pertaining to credit extended to her by Eldorado.
 

 In response to Strong’s opposition, Eldorado offered additional evidence including excerpts from Strong’s deposition and a supplemental affidavit by Whitemaine addressing extensions of credit to Strong since 2006.
 

 Eldorado’s motion was argued before the trial court on September 20, 2010. At the close of arguments, the trial court found the markers to be enforceable in accordance with the
 
 Telerecovery
 
 cases,
 
 supra.
 
 After Eldorado filed documentation of its requested attorney fees, the trial court signed the judgment granting Eldorado’s reconventional demand, ordering Strong to pay $144,000, with legal interest, plus attorney fees and expenses in the amount of $46,600, and dismissing Strong’s petition for declaratory judgment.
 
 [1]
 
 Strong now appeals. Eldorado has answered to seek additional attorney fees for appellate work.
 

 J^DISCUSSION
 

 The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2). A summary judgment is subject to a
 
 de novo
 
 review on appeal under the same criteria used by the trial court to determine whether summary judgment is appropriate.
 
 Stephenson v. Petrohawk Properties, L.P.,
 
 45,296 (La.App.2d Cir.6/2/10), 37 So.2d 1145. A motion for summary judgment shall be granted if the “pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to summary judgment as a matter of law.” La. C.C.P. art. 966(B).
 

 The party who moves for summary judgment bears the burden of proof. La. C.C.P. art. 966(C)(2). When a motion for summary judgment is made and properly supported, the adverse party’s response “must set forth specific facts showing that there is a genuine issue for trial.” La. C.C.P. art. 967(B). Otherwise, the failure
 
 *972
 
 of the nonmoving party to produce evidence of a material factual dispute in response to a properly supported motion for summary judgment mandates the granting of the motion.
 
 Samaha v. Ran,
 
 2007-1726, p. 4 (La.2/26/08), 977 So.2d 880, 883.
 

 With these well-known principles and the provisions of La. C.C. arts. 966 and 967 in mind, we •will proceed with our
 
 de novo
 
 review of the summary judgment at issue.
 

 | ^Eldorado moved for summary judgment on its reconventional demand for the amount due on the markers ($72,000), plus penalties and attorney fees as provided in La. R.S. 9:2782, which states:
 

 A. Whenever any drawer of a check dishonored for nonsufficient funds fails to pay the obligation created by the check within fifteen working days after receipt of written demand for payment thereof delivered by certified or registered mail, the drawer shall be liable to the payee or a person subrogated to the rights of the payee for damages of twice the amount so owing, but in no case less than one hundred dollars plus attorney fees and court costs.
 

 * * *
 

 C.(l) Before any recovery under Subsection a of this Section may be claimed, a written demand in substantially the form which follows shall be sent by certified mail or registered mail to the drawer of the check at the address show on the instrument:
 

 “You are hereby notified that a check numbered_, issued by you on_ (date), drawn upon _, (name of bank), and payable to _, has been dishonored. Pursuant to Louisiana law, you have fifteen working days from receipt of this notice to tender payment in full of the amount of the check plus a service charge of twenty-five dollars or five percent of the face amount of the check, whichever is greater, the total amount due being_Unless this amount is paid in full within the fifteen-working-day period, the holder of the check may file a civil action against you for two times the amount of the check or one hundred dollars, whichever is greater, plus any court costs and reasonable attorney fees incurred by the payee in taking the action.”
 

 (2) Notice mailed by certified or registered mail evidenced by return receipt to the address printed on the check or given at the time of issuance shall be deemed sufficient and equivalent to notice having been received by the person making the check.
 

 (3) It shall be prima facie evidence that the drawer knew that the instrument would not be honored if notice mailed by certified or registered mail is returned to the sender when such notice is mailed within a reasonable time of dishonor to the address printed on the instrument or given by the drawer at the time of issuance of the check.
 

 17Whitemaine’s affidavit states that Strong executed four makers totaling $72,000 in favor of Eldorado. He explains that a marker is a negotiable instrument evidencing the exchange of funds in the form of chips from the casino to a patron and the patron’s unconditional promise to pay the amount shown on the marker. The affidavit relates that the markers were returned marked NSF when Eldorado attempted to negotiate them. By demand letter dated January 29, 2010, Eldorado sought payment from Strong. Although she received the certified demand letter, Strong had not tendered payment. Copies of the markers signed by Strong and marked NSF by her bank, the certified demand letter, which appears in compliance with the requirements of La. R.S. 9:2782, and the
 
 *973
 
 return receipt were attached to White-maine’s affidavit.
 
 [2]
 

 Eldorado properly supported its motion for summary judgment by setting forth facts establishing its entitlement to the relief sought. To avoid summary judgment, Strong’s response must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B). We will examine each of Strong’s arguments to determine whether she has met this burden.
 

 Texas Law v. Louisiana Law
 

 Strong argues that the trial court erred in granting summary judgment in favor of Eldorado because the law of Texas, rather than that of Louisiana, | ^applies. Texas has a strong public policy against gambling on credit and the enforcement of gambling debts.
 
 Carnival Leisure Industries, Ltd. v. Aubin,
 
 938 F.2d 624 (5th Cir.1991). As such, Strong argues that the debt on the markers is unenforceable if Texas law applies. She contends that analysis under the conflict of laws provisions favors application of Texas law.
 

 The general and residual rule governing conflict of laws issues is La. C.C. art. 3515, which states:
 

 Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
 

 That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; (2) and the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
 

 As explained in Comment (a) of the Revision Comments-1991, La. C.C. art. 3515 provides the general principles from which the more specific conflict articles derive and in light of which they should be applied.
 

 Because this matter concerns enforcement of a conventional obligation, La. C.C. art. 3537 is the more specific provision. Like Article 3515, La. C.C. art. 3537 directs that the issue is to be governed by the law of the state whose policies would be most seriously impaired if its law were not applied and explains this determination as follows:
 

 That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, Land the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multi-state commercial intercourse, and of protecting one party from undue imposition by the other.
 

 Instead of “a mechanistic counting of contacts” to determine which state’s law applies, the determinative contacts should relate to the state’s policies that would be
 
 *974
 
 most seriously impaired if its law were not applied to the issue. See La. C.C. art. 3537, Comment (E) of Revision Comments — 1991.
 

 Strong asserts that she is a Texas resident and that the markers were presented to her bank in Texas for payment from funds in her Texas bank account. She argues that Texas has the most significant contacts and relationship to the parties and transaction at issue and that Texas’s public policy against enforcing gambling debts would be most seriously impaired if its law is not applied. She also asserts that there are disputed issues of material fact related to the factors to be considered under La. C.C. art. 3537 that preclude summary judgment.
 

 Eldorado counters that there are no material facts in dispute that would prevent a determination of whether Texas or Louisiana law applies. We agree. The undisputed facts allow us to determine the applicable law.
 

 While Texas has a strong public policy against gambling on credit and enforcing gambling debts, Louisiana’s public policy favors strictly regulated legalized gaming to promote the state’s economic development as expressed in La. R.S. 27:2(A). In authorizing riverboat gaming, the legislature declared the following public policy in La. R.S. 27:42(A)(1):
 

 | in(l) The development of a historic riverboat industry is important to the economy of the state of Louisiana in that it will assist in the continuing growth of the tourism industry and thus will benefit the general welfare of our citizens and create new jobs.
 

 The state’s public policy on gaming is reiterated in La. R.S. 27:202(B)(1).
 

 Having established the competing policies of Texas and Louisiana, we must evaluate them in light of the factors outlined in La. C.C. art. 3537. Strong is a Texas resident who traveled to Louisiana on multiple occasions for the purpose of gambling. As shown by the depositions of Eldorado personnel and Strong’s own affidavit, she was a frequent patron of Eldorado in Shreveport where she had an existing line of credit since 2006. Strong negotiated, formed, and executed the four markers at issue in Louisiana. Strong used the markers to receive funds in the form of chips, and she used the chips to gamble. If luck had been on Strong’s side, she could have paid the markers with her winnings. Alas, she lost. The markers remained unpaid for over 30 days. Eldorado then attempted to negotiate the markers with Strong’s bank in Texas where they were dishonored due to insufficient funds in her account. None of these facts are disputed.
 

 While both states have contacts with the parties, evaluation of each state’s public policy in light of these contacts, the purpose of the markers, and the policies outlined in Articles 3515 and 3537 establishes that Louisiana’s policy favoring legalized gaming to promote the state’s economic development and tourism would be most seriously impaired if its law is not applied. This policy would be thwarted if residents from states which disfavor gambling or the enforcement of gambling debts are allowed to rely on the application of such states’ laws to escape obligations incurred Inhere while willingly participating in sanctioned gaming activities. As pointed out by Eldorado, application of Texas law would likely mean that it and every other authorized casino in Louisiana would be unable to enforce markers against Texas residents who play at the various gaming establishments in this state. The inability to enforce markers would have negative consequences for the profitability of the casinos and thereby impair the promotion of economic development in this state through the riverboat gaming industry.
 

 
 *975
 
 By availing herself of legalized gaming offered here, Strong would justifiably expect her relations with Eldorado or other Louisiana-based casinos to be governed by the laws of this state rather than those of Texas, where casino-based gaming is not available. Application of Louisiana law to determine whether markers are enforceable is particularly warranted in matters like this one where the obligation was incurred in Louisiana and is brought by the parties before the courts of this state to be enforced or declared unenforceable. Texas’s policy against gambling on credit and enforcing gambling debts will not be seriously impaired if its law is not applied because Strong did not gamble in Texas, she did not incur the debt there, and Texas courts are not being asked to enforce the debt in contravention of that state’s public policy.
 
 [3]
 

 112For these reasons, we find no merit to Strong’s argument that Texas law applies. Analysis under the conflict of laws provisions favors application of Louisiana law in this matter.
 

 Enforcement of Markers Under Louisiana Law
 

 Strong argues that the markers are unenforceable under La. C.C. arts. 2983 and 2984. Article 2983 prohibits an action for the payment of what has been won at gaming or by a bet, and Article 2984 prohibits an action by the loser to reclaim what he voluntarily paid, unless the winner engaged in fraud, deceit, or swindling. The issue of whether the enforcement of markers is prohibited by these provisions has been addressed by the first, third, and fifth circuit courts of appeal. Each has concluded that markers are enforceable.
 

 In
 
 Major, supra,
 
 the issue before the court was whether checks and/or markers executed by the defendant while gambling at casinos are unenforceable under La. C.C. arts. 2983 and 2984. Reversing a summary judgment in favor of the defendant-debtor, the appellate court found that he had not incurred a gambling debt. Major had executed the markers in exchange for chips, which he then used to gamble. The court reasoned that he could have chosen to leave with the chips or convert them to cash rather | l3than gamble. The fact that Major chose to gamble with the chips had no bearing on the underlying obligation sought to be enforced, namely, the exchange of the checks/markers for the chips.
 

 
 *976
 
 The third circuit in
 
 Tribble, supra,
 
 applied the same reasoning in enforcing a promissory note signed by the defendant. The obligation underlying the note was based on markers signed by Tribble at a casino and for which she received chips in a value equal to their amount. The court noted that Tribble could have exchanged the chips for cash rather than gamble. The fact that she gambled and lost did not make the debt on the markers a gambling debt.
 

 Different reasoning was applied to reach the same result in
 
 Gaulon, supra.
 
 The court rejected the argument that markers are unenforceable under La. C.C. art. 2983 because they are incurred in an illegal activity. The court noted that the legislature authorized riverboat gaming as provided in La. R.S. 27:41
 
 et seq.,
 
 and that the crime of gambling defined in La. R.S. 14:90 does not include riverboat gaming activities.
 
 See
 
 La. R.S. 14:90(C). Because riverboat gaming activities are legal, the markers did not represent a debt incurred in an illegal activity and enforcement was not prohibited by La. C.C. art. 2983.
 
 See Lauer v. Catalanotto,
 
 522 So.2d 656, 658 (La.App. 5th Cir.1988), stating that “C.C. Art. 2983’s prohibition of recovery for gambling debts is express and must be applied to debts resulting from all unauthorized forms of gambling.”
 

 We agree with the reasoning of these decisions and decline Strong’s invitation to reach a different result. We find that it would be inconsistent 114for the legislature to permit gaming but prevent the enforcement of gaming-related debts. The gaming industry in Louisiana is subject to strict regulation under the Gaming Control Law. La. R.S. 27:2(A) states that “all persons, locations, practices, associations and activities related to the operation of licensed and qualified gaming establishments ... shall be strictly regulated.”
 
 See also
 
 La. R.S. 27:202(B)(3). We have found no provision under the Gaming Control Law that prohibits the extension of credit to a patron of a gaming establishment. In fact, a riverboat gaming licensee is expressly permitted to issue credit in its gaming operations. LAC 42:XIII.2729.
 
 [4]
 
 Moreover, the regulations permit the collection of such debts on behalf of licensees by its employees, independent agents, attorneys, or affiliated or wholly-owned corporations, and bonded and licensed collection agencies. LAC 42X111.2921. It would be inconsistent and irreconcilable to allow for the extension and collection of credit yet prohibit the enforcement of such debts in our courts under La. C.C. arts. 2983 and 2984.
 

 As made clear by
 
 Major, supra,
 
 the obligation to be enforced when such credit is extended is the exchange of the markers or checks for chips which a patron then by choice may use to gamble. If a patron instead chooses to exchange the chips for cash and fails to pay the marker, the debt still exists and clearly would be enforceable. The fact that a patron gambles and loses is of no bearing on his or her obligation to repay the debt on the | ^marker. Therefore, we find that enforcement of the four markers at issue is not prohibited by La. C.C. arts. 2983 and 2984.
 

 Alternatively, Strong argues the markers are not enforceable because they 'did not arise from legal gaming activities conducted in accordance with the Gaming Control Law. She asserts that pursuant to La. R.S. 27:71 and applicable regulations, Eldorado was required to develop
 
 *977
 
 and follow certain internal control procedures. Strong claims that Eldorado’s failure in its dealings with her to follow its internal controls related to responsible gaming, check cashing policies and procedures, and the issuance of credit means that the markers are unenforceable. Specifically, she complains that Eldorado failed to honor her request to self-limit her credit line to $30,000, and that it permanently and improperly increased her credit on August 12-13, 2009, through the issuance of the TTO — This Trip Only Marker for $12,000 and by allowing her to cash three checks totaling $60,000. She complains that Eldorado processed her personal checks as business checks to allow her instant access to funds and thereby further extend her credit limit. She also complains that the increase in her credit limit that night was not authorized by the appropriate personnel.
 

 Initially, we note that exhibits offered by the parties establish that Strong had self-limited her credit to $30,000 on November 13, 2008, after sustaining heavy losses that year and after Eldorado agreed to write off markers she owed totaling $150,000. Strong then signed a form on January 28, 2009, increasing her credit limit to $60,000. According to her deposition, she did not thereafter seek to have her limit reduced. The | ^increased limit was in effect for over six months as of August 12-13, 2009, when the markers at issue were executed. On the night at issue, Strong executed three markers of $20,000 each and an additional TTO — This Trip Only marker of $12,000. The TTO is a temporary increase of up to 20 percent of a patron’s credit limit and is specifically authorized by Eldorado’s internal controls. Additionally, Strong cashed three checks of $20,000 each. These checks were negotiated by Eldorado, honored by Strong’s bank, and have no bearing on whether the markers are enforceable.
 

 Even if Eldorado failed to follow its internal controls as alleged by Strong, there is no support for her argument that such violations make the debt at issue one arising from illegal gaming activities and the markers unenforceable under La. C.C. arts. 2983 and 2984. As stated, the gaming industry is subject to strict regulation. La. R.S. 27:15(A) provides that all gaming activities and operations are regulated by the Gaming Control Board. The board has the authority to conduct administrative hearings and to impose civil penalties on gaming licensees or even revoke or suspend a license for violations of the provisions of the Gaming Control Law and its regulations. La. R.S. 27:15(D); LAC 42:XIII.2325. However, the Gaming Control Law does not provide that a violation by a licensee of its internal controls renders a marker unenforceable. Even if there are facts in dispute as to the alleged failure of Eldorado to have followed its internal controls, these facts are not material because the relief Strong seeks, to have the markers declared unenforceable, is not available.
 

 117For these reasons, we find no issue of material fact and no merit to Strong’s argument that summary judgment is precluded because enforcement of the markers is prohibited by La. C.C. arts. 2983 and 2984 as illegal gaming debts.
 

 Markers as Negotiable Instruments
 

 Strong argues that the markers are not negotiable instruments and, therefore, are not enforceable under La. R.S. 9:2782. She asserts that the markers do not meet the requirements of La. R.S. 10:3-104(a)(l) or (2).
 

 La. R.S. 10:3-104(a) defines “negotiable instrument,” in pertinent part, as an “unconditional promise or order to pay a fixed amount of money” that:
 

 
 *978
 
 (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
 

 (2) is payable on demand or at a definite time; and
 

 (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money....
 

 The TTO marker is payable to the order of Eldorado, thus satisfying the requirements of La. R.S. 10:8 — 104(a)(1). The other three markers do not name a payee. However, a promise or order that does not state a payee is payable to bearer. La. R.S. 10:3 — 109(a)(2). Under this provision, the markers are payable to Eldorado as bearer.
 

 All four markers also satisfy the requirements of La. R.S. 10:3 — 104(a)(2). A promise or order that does not state any time of payment is payable on demand. La. R.S. 10:3 — 108(a). Because none of the markers state a time for payment, they are payable on demand. This is so regardless of |TSwhether, as alleged by Strong, Eldorado decides on a case-by-case basis when to demand payment.
 

 For these reasons, we find no merit to Strong’s argument that summary judgment is precluded because the markers are not negotiable instruments.
 

 Presentment Before Payment Due
 

 Strong argues that Eldorado presented the markers for payment before they were due and for this reason may not enforce the markers under La. R.S. 9:2782. She asserts that, based on past dealings between the parties, payment was due within 30 days of the date of the markers unless extended or excused by Eldorado. She further asserts that Eldorado extended the payment date to October 31, 2009. This is based on a notation in Eldorado’s computer file pertaining to her which states “PER IAN PUSH MARKERS TO OCT. 31” and appears to have been entered on September 18, 2009. However, Whitemaine opted to negotiate the markers for payment on October 16, 2009.
 

 As stated, the markers were payable on demand. Moreover, Eldorado’s internal controls on marker disposition state, “No credit authorizer may agree to settlement terms beyond 30 days unless approved by the General Manager.” Ian Cairns was not the general manager. Additionally, Strong met with Whitemaine, Urland, and Cairns before the markers were presented for payment. Strong stated in her deposition that she wanted to meet because she was upset that Whitemaine had not returned her call. Whitemaine stated in his deposition that they met about the unpaid | l9markers. Regardless of the reason, the depositions of Strong, Whitemaine, Cairns, and Urland indicate that the meeting did not go well. At the end of the meeting, Whitemaine asked her about the markers, and she told him, as stated in her deposition, “Mike, do whatever you want to.” This is related in Whitemaine’s deposition as well. A notation in Strong’s file entered October 15, 2009, reads “ALL MKRS SENT FOR DEPOSIT — 10/16/09. DO NOT HOLD PER WHITEMAINE.”
 

 Based on the above, we find no merit to Strong’s argument that the markers were presented before they were due. The markers were clearly payable on demand, and Strong indicated to Whitemaine that he could do “whatever” he wanted to do with the markers. Thus, there was no agreement to extend the payment date to October 31, 2009. The markers were presented for payment and dishonored due to nonsufficient funds thereby entitling Eldorado to pursue relief under La. R.S. 9:2782.
 

 
 *979
 

 Compliance with La. R.S. 9:2782
 

 Strong complains that Eldorado failed to comply with the strict requirements of La. R.S. 9:2782 and is not entitled to judgment awarding the statutory damages, attorney fees, and costs.
 

 It is clear that markers are enforceable under the NSF statute.
 
 Gaulon, supra.
 
 However, La. R.S. 9:2782 is penal in nature and must be strictly construed.
 
 Redden v. Ripley,
 
 37,905 (La.App.2d Cir.12/10/03), 862 So.2d 469. Recovery under the NSF statute requires proof of written demand for payment in substantially the form provided by the statute, delivery by certified or registered mail to the drawer at the address shown | afton the instrument, proof of receipt, and nonpayment within 15 days of receipt of written demand.
 
 Cole Builders, L.L.C. v. J & J Properties of West Monroe, LLC,
 
 42,214 (La.App.2d Cir.6/20/07), 961 So.2d 569.
 

 Referring to her allegation that Eldorado presented the markers for payment before they were due, Strong argues that Eldorado cannot use La. R.S. 9:2782 to enforce an obligation that had not yet arisen. Because we have found that the markers are payable on demand, we find no merit to this argument.
 

 Next, Strong asserts that Eldorado did not send written demand to the address on the markers as required by La. R.S. 9:2782(0(1). She points out that there is no address on the face of the markers and no evidence that she gave an address when the markers were issued. Eldorado counters that it had on file two addresses given by Strong when she initially applied for credit and that it sent the demand letter to both addresses.
 

 La. R.S. 9:2782(0(1) states that the demand letter is to be mailed to “the address shown on the instrument,” but R.S. 9:2782(0(2) and (3) refer to the address printed on the check or given
 
 at the time of issuance.
 
 No address was printed on the face of the markers at issue in
 
 Gaulon, supra.
 
 However, the court did note that Gaulon did not challenge whether the formalities of the statute were followed. In
 
 TeleRecovery of Louisiana, Inc. v. Rayborn,
 
 2001-0358 (La.App. 1st Cir.3/28/02), 814 So.2d 688, the court disallowed recovery under the NSF statute on the basis that the demand letter was not sent to the address that was shown on the markers. The markers had “12222 Florida Blvd.” as the street address, but the demand |21letter was addressed to “1222 Florida Blvd.” The record did not indicate whether the defendant had actually received the demand letter. Neither case is dispositive of the issue here.
 

 Although no address is printed on Strong’s markers, Eldorado had on file at the time of issuance two addresses given by her. One was a post office box and the other was a business address. Strong provided the post office box address on her credit application, and the business address was on a copy of her driver’s license. Eldorado mailed the demand letter to both addresses on file. Strong admitted in her answer to Eldorado’s reconventional demand that she received the demand letter.
 

 The markers were executed on the basis of Strong’s preexisting, approved line of credit. Eldorado had an ongoing relationship with her and had her addresses on file at the time of issuance of the markers. Thus, it had no need to obtain her address anew when it issued the markers, unlike a situation where an individual either first applies for credit or writes a check to some business and must provide identifying information for acceptance. Here, Strong already had given her address(es) to Eldorado when the markers were issued. On the basis of these facts, we find that Eldorado complied with the requirements of
 
 *980
 
 the NSF statute by mailing the demand letter to the addresses that had been given at the time of issuance of the markers.
 

 Strong argues that under La. R.S. 9:2782, a check (marker) that does not accurately reflect the payee does not confer on the purported payee the right to enforce the check (marker). She notes that the three $20,000 |22markers did not name a payee. We have found that these markers were payable to bearer, namely, Eldorado. Moreover, as holder of the markers, Eldorado is entitled to enforce them. La. R.S. 10:3-301. We find no support for Strong’s argument in the NSF statute.
 

 For these reasons, we find that summary judgment is not precluded on the basis that Eldorado failed to strictly comply with the provisions of La. R.S. 9:2782.
 

 Disputed Issues of Material Fact
 

 Lastly, Strong argues that there are disputed material facts that make summary judgment inappropriate. However, all the facts she alleges to be disputed pertain to the matters addressed in the other assignments of error. In conducting our
 
 de novo
 
 review of this record, we And no genuine issue of material fact for trial. We further find that Eldorado is entitled to summary judgment as a matter of law on its reconventional demand.
 

 Eldorado's Answer to Appeal
 

 Seeking additional attorney fees and expenses for work in defense of the appeal, Eldorado filed a timely answer to Strong’s appeal. In support of its request, Eldorado filed a motion to submit an affidavit requesting attorney fees and expenses totaling $9,432.80. Because no opposition to the motion has been received, we grant the motion to allow the affidavit to be filed in the record.
 

 La. R.S. 9:2782(A) allows for the recovery of attorney fees, and Eldorado has already been awarded $46,600 in attorney fees and expenses by the trial court. When a party is awarded attorney fees by the trial court, 1 Mis forced to defend an appeal, and is successful on appeal, an increase in attorney fees is generally allowed. Even when requested, additional attorney fees may not be granted where the appellate court finds that the amount awarded in the trial court was sufficient to compensate counsel for both the work before the trial court and on appeal.
 
 Family Care Services, Inc. v. Owens,
 
 45,505 (La.App.2d Cir.8/11/10), 46 So.3d 234;
 
 Sims v. Sun Chemical Corp.,
 
 34,947 (La.App.2d Cir.8/22/01), 795 So.2d 439. Reasonableness of attorney fees are determined by considering the ultimate result obtained, the responsibility incurred, the importance of the litigation, the amount of money involved, the intricacies of the facts involved, the diligence and skill of counsel, and the court’s own knowledge.
 
 Skannal v. Bamburg,
 
 44,820 (La.App.2d Cir.1/27/10), 33 So.3d 227,
 
 writ denied,
 
 2010-0707 (La.5/28/10), 36 So.3d 254; LSBA Rules of Prof. Conduct 1.5(a).
 

 Here, counsel for Eldorado was successful in recovering the amount owed on the markers plus damages under the NSF statute for a total amount of $144,000, plus the aforementioned attorney fees and costs of slightly over 30 percent of the amount recovered. Unquestionably, counsel (for both sides) exhibited great diligence and skill in trying this matter, which involved multiple issues and facts for consideration. However, the threshold issues concerned whether the markers were even enforceable. This had to be determined before considering whether recovery was warranted under the NSF statute. Notably, the issues and arguments on appeal had already been fleshed out and thoroughly addressed in ^memorandum filed in the lower court in response to Strong’s opposi
 
 *981
 
 tion to summary judgment. Considering these factors and the amount already recovered, we find that an additional award of $2,500 is reasonable as an increase in attorney fees for defending the appeal.
 

 CONCLUSION
 

 For the reasons explained in this opinion, we affirm the trial court’s summary judgment in favor of Eldorado and its dismissal of Strong’s claim. We award Eldorado additional attorney fees for appeal in the amount of $2,500. Costs of appeal are assessed against Strong.
 

 AFFIRMED.
 

 [1]
 

 . The date on the judgment is September 8, 2010. This is apparently an error. The record shows that Eldorado filed an original and two copies of the judgment with the clerk of court on October 4, 2010, so that the original could be presented to the trial judge for execution. Notice of judgment was mailed to the parties on October 20, 2010.
 

 [2]
 

 . Marker No. 11470 was not attached as an exhibit to Whitemaine’s affidavit. However, it was attached as an exhibit to the pleadings offered by Eldorado in support of its motion, and it was included as an exhibit in Eldorado’s response to Strong’s opposition filings.
 

 [3]
 

 . In Texas, the courts have generally applied Texas law in matters involving the enforcement of a gambling debt incurred by a Texas resident. See
 
 Aubin, supra,
 
 and
 
 Carnival Leisure Industries, Ltd. v. Aubin,
 
 53 F.3d 716 (5th Cir.1995), wherein the first case the debt incurred by a Texas resident at a casino in the Bahamas was held unenforceable in Texas due to its public policy against the enforcement of gambling debts, and in the latter case the casino was again refused recovery on the basis of that public policy even though it alleged the Texas resident committed fraud by signing the markers knowing they were unenforceable under Texas law. In bankruptcy proceedings involving Texas residents who owe gambling debts, the courts have applied Texas law and, on the basis of its policy against gambling debts, denied complaints by casinos alleging such debts are not discharge-able. See
 
 PNK v. Guevara,
 
 409 B.R. 442 (Bankr.S.D.Tex.2009), and
 
 PNK v. Tarkbaf,
 
 Not Reported (Bankr.S.D.Tex.2010), 2010 WL 148412. However, the U.S. District Court for the Southern District of Texas in an unpublished opinion,
 
 Jazz Casino Company v. Rhodes,
 
 No. 02-2449 (2003), applied Louisiana’s conflict of law rules and determined that under these rules Louisiana law must be applied to determine whether a gambling debt incurred in Louisiana by a Texas resident is dischargeable in a bankruptcy filed in Texas. While these cases are informative as to what Texas courts will do in proceedings brought to enforce gambling debts against Texas residents, they are not determinative of whether the law of Louisiana or Texas applies in this matter.
 

 [4]
 

 . Regulations set forth in the Louisiana Administrative Code are promulgated in accordance with La. R.S. 27:15 and R.S. 27:24.